STATE OF NORTH CAROLINA v. BRYANT HENRY WILLIAMS, JR.

No. 25

(Filed 12 March 1975)

**1. Criminal Law § 126— unanimity of verdict**

The Constitution of this State requires a unanimous verdict for a valid conviction for any crime. Art. I, § 24, of the N. C. Constitution.

**2. Jury § 7— State's right to unbiased jury**

The State, like the defendant, is entitled to a jury, all members of which are free from a preconceived determination to vote contrary to its contention concerning defendant's guilt of the offense for which he is being tried.

**3. Jury § 6— prospective jurors — examination — capital punishment views**

In a capital case, both the State and the defendant may propound questions to prospective jurors concerning their views about the death penalty.

**4. Constitutional Law § 29; Criminal Law § 135; Jury § 7— prospective jurors — capital punishment views — challenge for cause**

The trial court in a capital case properly sustained the State's challenge for cause of three prospective jurors who stated, in response to questions by the solicitor and by the court, that even though the evidence satisfied them beyond a reasonable doubt of defendant's guilt of the offense charged, they could not vote for such a verdict knowing that the death penalty was required thereupon.

**5. Rape § 5— sufficiency of evidence**

The State's evidence was sufficient for the jury to find that the offense of rape was perpetrated on the 13-year-old prosecuting witness after she accepted a ride in a dump truck and that defendant was the perpetrator of it.

**6. Constitutional Law § 36; Criminal Law § 135; Rape § 7— death penalty for rape**

Imposition of the death sentence for the crime of rape is constitutionally permissible.

**7. Constitutional Law § 36; Criminal Law § 135; Rape § 7— Act creating two degrees of rape — nonretroactivity**

Provision of the 1974 Act rewriting G.S. 14-21 and creating two degrees of rape which declared that the Act "shall become . . . applicable to all offenses hereafter committed" is a saving clause, showing the intent of the Legislature to leave the preexisting statute in effect as to the elements of and punishment for the crime of rape committed prior to the effective date of the Act, 8 April 1974; consequently, the Act is not retroactive so as to make unlawful the imposition upon defendant of a sentence of death for an offense, committed prior to its effective date, which falls within the definition

of second degree rape in Section 2(b) of the Act. Ch. 1201, Session Laws of 1973.

Chief Justice SHARP and Justices COPELAND and EXUM dissenting as to the death penalty.

APPEAL by defendant from *McKinnon, J.*, at the 25 February 1973 Criminal Session of WAKE.

Upon an indictment, proper in form, defendant was tried on the charge of rape. He was found guilty as charged and appeals from a sentence to death, imposed pursuant to the verdict.

The evidence for the State was to the following effect:

Shortly after 2:30 p.m., on 16 May 1973, the prosecuting witness, a 13 year old girl about 5 feet in height and weighing less than 90 pounds, carrying her school books, was walking along Lake Boone Trail in the City of Raleigh from her school to her home. A red and green dump truck, loaded with dirt, stopped and the driver asked if she would like a ride to the top of the hill. She accepted the invitation. Upon arriving at the point where she should alight to go into her home, she told the driver she wanted to get off. He did not stop but continued to drive on out of the city and into Umstead Park, where he turned onto a little used dirt road. There he told the child to get out. When she did, he seized her, put his hand over her mouth when she tried to scream and told her he would kill her if she did not stop and that if she did not permit him to do what he wanted, she would never go home. He pulled her a short distance into the woods and there, over her protest, partially disrobed her and had sexual intercourse with her. She had not previously had sexual intercourse. She bled as the result of the penetration and also because she was then in her menstrual period. After the completion of the sexual act, the defendant permitted her to dress, gather up her school books and get back in the truck, which she did because she was afraid and wanted to go home. He turned the truck around, having to reverse it at least once in order to make the turn. At some point during the ride he talked on his two-way radio but she did not understand what he said. Driving back along Lake Boone Trail, he let her out and she went to the home of her friend, from which she telephoned her mother who was at work. The police were called and she was taken to the hospital and examined by the doctor who corroborated her testimony concerning the penetration.

Later that afternoon, the child gave the investigating officers a description of the truck and of the driver, her assailant. She told them the truck had a red cab with a green body, it was loaded with dirt and had the number 6 painted on it in silver. At the same time, she described her assailant, the truck driver, to the officers as a white man with red, wavy hair and a lot of freckles on his face and arms, wearing a blue shirt with sleeves rolled up and having on it a name, the first three letters of which were "BRY." She also told the officers that when he first picked her up he was wearing sun glasses which looked like mirrors so that she could not see his eyes.

On 16 May 1973, a construction project involving excavation and the hauling away of dirt was in progress not far from the point at which the child was picked up by her assailant. The defendant was driving one of a number of dump trucks, each of which, in regular rotation, was loaded with dirt at the construction project, hauled the dirt away, dumped it and returned for another load, the circuit for each truck taking approximately 15 minutes. The defendant was absent from his regular place in the truck lineup for an hour, beginning at approximately 2:35 p.m. on this afternoon, missing three loadings of the trucks.

Later that afternoon, a police officer, patrolling in his police vehicle, observed and followed a dump truck meeting the description given by the child of the vehicle in which she had ridden. He followed it and, by radio, arranged for a road block ahead of the truck. It was stopped and the defendant was arrested. On his blue shirt there was a name patch carrying his name "BRYANT." He has red hair. The truck which he was driving was green with a red cab and had a white or silver 6 painted on the body. The officers made photographs and impressions of the tire treads of the truck. Photographs of the truck were identified by the girl, and also by a boy, who, while playing near by, observed her getting into the truck of her assailant, as being like the truck in which she rode.

On the afternoon of the offense, the girl was taken by the investigating officers to the police headquarters and there, in the presence of and with the consent of the defendant's then attorney, was shown a number of photographs from which she identified the photograph of the defendant as a picture of her assailant.

Later, on the same afternoon, the investigating officers accompanied the child and her mother to the place to which she

State v. Williams

directed them as being the scene of the offense. There they observed on the surface of the dirt road truck tire tracks which matched the tire treads on the truck driven by the defendant at the time of his arrest. On top of one of these tire tracks was a print of a tennis shoe which, in size and tread marks, matched the tennis shoe worn by the child. Hanging on a bush at the place where the child said the offense occurred was a pair of sunglasses.

The child, testifying at the trial, positively and unequivocally identified the defendant in the courtroom as her assailant. To this testimony there was no objection.

On the front tail of the shirt worn by the defendant at the time of his arrest, on the front tail of the T shirt and on the outside front of the trousers then worn by him, near the zipper, were stains identified by an expert serologist as human blood, group A. The girl's blood was group A. The serologist did not examine a specimen of blood drawn from the defendant, but the Solicitor stipulated that the defendant's blood is also in group A.

The defendant did not testify but offered three witnesses: the bookkeeper of his employer, an employee of a tire company and the wife of the defendant. Their testimony was to the following effect:

The defendant's wife testified that she worked in the office of the trucking company by which the defendant was employed. They went to work together on the morning that the offense in question was committed. At noon they went home for lunch, at which time he told her he was feeling badly. She then noticed dark spots on his shirt which "looked like blood." Two days prior to this she had observed her husband vomiting blood. At noon on 16 May, the splotches on his shirt looked similar to the ones shown in the photograph of the defendant taken at the police station after the occurrence here in question.

The tire company employee testified that, in response to a call, he went to the defendant's job site and fixed a flat tire on the defendant's truck, "somewhere" between 2:00 p.m. and 4:00 p.m. on 16 May. The defendant's truck was then at the place where dirt was being loaded into his and other trucks. After the tire was fixed, which took about 15 or 20 minutes, the defendant pulled his truck back in the loading line and it was loaded with dirt.

The bookkeeper for the defendant's employer testified that, about 2:30 p.m. on the day this offense was committed, the defendant called her on his two-way radio and said that he had a tire "that was going flat." She told him to go to the filling station and put air in it and see "if it would hold." This filling station was on Lake Boone Trail at about the point where the little girl was picked up by her assailant. A few minutes after that radio call the defendant again called her on his radio saying that he was going "to try to make it to the dump and unload." Shortly after 3:00 p.m., he again radioed her to ask if she had gotten in touch with "the tire man" and she replied that she had and the man would meet him on the job site to fix the tire. The defendant did not state where he was at the time of this last radio call. When this witness last saw the defendant on 16 May 1973, which was approximately 12:30 p.m., she did not observe any evidence of blood on his clothing, having no reason to look for any. The truck the defendant was driving on that date had a silver 6 on its back and is the one portrayed in the photographs identified by the witnesses for the State as the one driven by the assailant of the girl. The witness was unable to say where the defendant was at any particular time on 16 May 1973 after he left her office at 12:24 p.m.

*Attorney General Robert Morgan and Assistant Attorney General Thomas B. Wood for the State.*

*W. Arnold Smith for defendant.*

LAKE, Justice.

Approximately two-thirds of the defendant's brief is directed to his Assignment of Error No. 1, which reads:

"The Court erred in allowing the Solicitor to ask members of the jury panel questions regarding their moral or religious scruples about the death penalty in that such question eliminated all prospective jurors approved [opposed?] to capital punishment and denied defendant the right to be tried by a cross-section of his peers."

It is not clear from the defendant's brief whether his attack upon the trial, under this assignment of error, is directed to the trial court's permitting the Solicitor to ask questions of prospective jurors concerning their views as to the death penalty, or to the trial court's sustaining of challenges for cause by

reason of the responses made to such questions. In either view of it, this assignment of error is completely lacking in merit.

The defendant does not challenge the procedures whereby the jury panel was selected and summoned, nor does the record contain any suggestion of a basis for such challenge. The statutory procedures for its selection having been followed, the jury panel, in its entirety, was a representative cross-section of the people of Wake County. Of the 38 prospective jurors examined in the selection of the 12 who rendered the verdict and two alternates, only four indicated their opposition to the imposition of a death sentence in a proper case therefor.

[1] The defendant, in his brief, makes the startling observation that a jury's verdict finding a defendant guilty need not be unanimous, so the denial of the State's challenge to a juror, who under no circumstances would vote for a verdict of guilty of an offense for which the prescribed punishment is death, would not necessarily prevent the State from obtaining such a verdict. In *Apodaca v. Oregon,* 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed. 2d 184, and *Johnson v. Louisiana,* 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed. 2d 152, a sharply divided Supreme Court of the United States, a majority of which was unable to agree upon an opinion, sustained sentences imposed by state courts pursuant to verdicts of guilty reached by juries not unanimous. Neither of these was a capital case. Whether or not the Fourteenth Amendment to the Constitution of the United States prevents a state from imposing a death sentence upon a defendant convicted of a capital crime by a jury not unanimous, we need not now determine. It has never been doubted that the Constitution of this State requires a unanimous verdict for a valid conviction for any crime. Article I, § 24, of the Constitution of North Carolina provides:

> *"Right of jury trial in criminal cases.* No person shall be convicted of any crime but by the unanimous verdict of a jury in open court. The General Assembly may, however, provide for other means of trial for misdemeanors, with the right of appeal for trial de novo."

From time immemorial it has been standard practice in this State for prosecuting attorneys in capital cases to interrogate prospective jurors concerning their opposition, if any, to the imposition of the death penalty.

[2, 3] The State, like the defendant, is entitled to a jury, all members of which are free from a preconceived determination

to vote contrary to its contention concerning the defendant's guilt of the offense for which he is being tried. See, *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed. 2d 776. To that end, the State, like the defendant, is allowed certain peremptory challenges to prospective jurors, nine being allowed the State for each defendant in a capital case and 14 being allowed each such defendant. G.S. 9-21(b). In order to permit intelligent exercise of peremptory challenges, as well as to determine the existence of basis for a challenge for cause, wide latitude must be allowed counsel in the interrogation of prospective jurors. In *State v. Britt,* 285 N.C. 256, 267, 204 S.E. 2d 817, Justice Branch, speaking for a unanimous Court, said:

> "It is well established by our decisions and the decisions of the federal courts that in a capital case both the State and the defendant may, on the voir dire examination of prospective jurors, make inquiry concerning a prospective juror's moral or religious scruples, his beliefs and attitudes toward capital punishment, to the end that both the defendant and the State may be insured a fair trial before an unbiased jury. [Citations omitted.] A prospective juror's response to such inquiry by counsel may disclose basis for a challenge for cause or the exercise of a peremptory challenge. The extent of the inquiries, of course, remains under the control and supervision of the trial judge."

In *State v. Jarrette,* 284 N.C. 625, 638, 202 S.E. 2d 721, this Court said:

> "We have held many times that there is no error in permitting questions to be propounded to prospective jurors concerning their views about the death penalty. *State v. Rogers,* 275 N.C. 411, 168 S.E. 2d 345; *State v. Yoes,* and *State v. Hale* [271 N.C. 616, 157 S.E. 2d 386]; *State v. Spence,* 271 N.C. 23, 155 S.E. 2d 802."

[4]   A total of 38 prospective jurors was examined. The State challenged a total of eight of these, three for cause and five peremptorily, including four who stated no objection to the death penalty. The defendant challenged 14 peremptorily and two for cause. Each of the three prospective jurors challenged for cause by the State said, in response to questions by the Solicitor and by the Court, that even though the evidence satisfied her beyond a reasonable doubt of the defendant's guilt of the offense of rape, she could not vote for such a verdict know-

State v. Williams

ing that the death penalty was required thereupon. Under these circumstances, it was not error to sustain the Solicitor's challenge for cause. *Witherspoon v. Illinois, supra; State v. Ward,* 286 N.C. 304, 210 S.E. 2d 407; *State v. Sparks,* 285 N.C. 631, 207 S.E. 2d 712; *State v. Honeycutt,* 285 N.C. 174, 203 S.E. 2d 844; *State v. Crowder,* 285 N.C. 42, 203 S.E. 2d 38; *State v. Noell,* 284 N.C. 670, 202 S.E. 2d 750; *State v. Jarrette, supra; State v. Anderson,* 281 N.C. 261, 188 S.E. 2d 336; *State v. Westbrook,* 279 N.C. 18, 181 S.E. 2d 572; *State v. Atkinson,* 275 N.C. 288, 167 S.E. 2d 241. Furthermore, had these three challenges for cause not been sustained, the Solicitor could have challenged all of these jurors peremptorily without reaching his limit of nine such challenges.

[5] The defendant's Assignments of Error No. 9 and No. 11 are directed to the denial of the defendant's motions for a judgment of nonsuit and for a directed verdict. These assignments of error are patently without merit. The evidence for the State was abundantly sufficient to permit the jury to find that the offense of rape was perpetrated upon the prosecuting witness and that the defendant was the perpetrator of it. It is elementary that, upon a motion for judgment of nonsuit, or for a directed verdict, the evidence for the State is taken to be true and the State is entitled to every reasonable inference which may be drawn therefrom, contradictions and discrepanices in the State's evidence are disregarded and the evidence of the defendant in conflict with that of the State is not taken into consideration. Strong N. C. Index 2d, Criminal Law, § 104, and the numerous cases there cited. It is also elementary that upon the consideration of such a motion, evidence for the State, even though improperly admitted, is taken into account. *State v. Cutler,* 271 N.C. 379, 156 S.E. 2d 679; *State v. Walker,* 266 N.C. 269, 145 S.E. 2d 833; *State v. Virgil,* 263 N.C. 73, 138 S.E. 2d 777. The motion for judgment of nonsuit and the motion for a directed verdict of not guilty have the same legal effect. *State v. Britt, supra; State v. Glover,* 270 N.C. 319, 154 S.E. 2d 305.

[6] The defendant's Assignment of Error No. 14 is to the imposition of the sentence of death upon the verdict of guilty of rape. The defendant's contentions with respect to the validity of the death sentence for rape have been carefully considered and found without merit by this Court in a number of recent decisions. See: *State v. Noell, supra; State v. Jarrette, supra; State*

*v. Waddell,* 282 N.C. 431, 194 S.E. 2d 19. It would serve no useful purpose to repeat here the reasons for that determination.

[7]    At the time this offense was committed and at the time the defendant was tried, convicted and sentenced to death, G.S. 14-21, as construed by this Court in *State v. Waddell, supra,* made a sentence to death mandatory upon every person convicted of the rape of any female of the age of 12 years or more by force and against her will. Chapter 1201 of the Session Laws of 1973, § 2, ratified 8 April 1974, rewrote G.S. 14-21. As rewritten, the statute now makes provision for first degree rape, for which the punishment "shall be death," and for second degree rape, for which the punishment shall be "imprisonment in the State's prison for life, or for a term of years, in the discretion of the court."

The same Act also rewrote G.S. 14-17, dealing with murder, G.S. 14-52, dealing with burglary, G.S. 14-58, dealing with arson, G.S. 148-58, dealing with the parole of prisoners, and G.S. 14-2, dealing with the punishment of persons convicted of felonies for which no specific punishment is prescribed by statute. Section 8 of the Act provides:

"This act shall become effective upon ratification *and applicable to all offenses hereafter committed."* (Emphasis added.)

The Act was ratified, and thus became effective, 8 April 1974 and is, in its entirety, "applicable" to all offenses thereafter committed.

The defendant contends that this statute is retroactive so as to make unlawful the imposition upon this defendant of a sentence to death, since the prosecuting witness, at the time of the offense, was more than 12 years of age, her submission was not procured by the use of a deadly weapon and serious bodily injury (other than the rape, itself) was not inflicted upon her and, therefore, the offense falls within the definition of second degree rape contained in Section 2(b) of the above mentioned Act of 1974.

This contention requires us to construe Section 8 of the 1974 Act. It is our authority and duty, in capital cases as in other cases, to apply a valid statute so as to give to it the meaning and effect intended by the Legislature at the time of its enactment. Throughout the years, rules of statutory construction

have been evolved and declared whereby courts are to determine such legislative intent. They apply to capital cases just as to other cases. Because of the gravity of a capital case, both in its consequences to the defendant and in the consequences to the State of the offense with which the defendant is charged, this Court always considers the record and the legal contentions in such case with special care, but in a capital case, just as in any other case, we are not at liberty to disregard established principles of law in arriving at the intent of the Legislature in enacting a statute, nor, having determined that intent, may we properly refuse to give it effect.

We find no merit in this contention of the defendant. In clear, explicit terms the Legislature provided, "This act shall become * * * applicable to all offenses hereafter committed." Had these words been omitted, the Act would, nevertheless, apply to all offenses committed after its effective date, 8 April 1974. Consequently, these words were not used for the purpose of giving the Act that effect. It is a well established principle of statutory construction that a statute must be construed, if possible, so as to give effect to every part of it, it being presumed that the Legislature did not intend any of its provisions to be surplusage. *State v. Harvey,* 281 N.C. 1, 19, 187 S.E. 2d 706; *Clark v. Carolina Homes,* 189 N.C. 703, 710, 128 S.E. 20; *State v. Barksdale,* 181 N.C. 621, 625, 107 S.E. 505.

In *State v. Broadway,* 157 N.C. 598, 72 S.E. 987, a statute, providing for the punishment of the crime of incest, was amended so as to increase the penalty. The amending act provided that the amendment should be in force "from its ratification." This Court, speaking through Chief Justice Clark, said:

"The change in the punishment took effect only by terms of the statute, 'from its ratification,' and hence did not apply to an offense which was committed prior to its enactment. Repeals by implication are not favored by the law. In this case there is neither express repeal of any part of the statute, nor any repeal by implication. The statute stands intact as it was, the Legislature simply adding ten years to the quantum of the punishment which the judge might impose. This additional ten years was to take effect in the future, and indeed under the constitutional provision forbidding *ex post facto* laws such additional punishment could not have been applied to such crime unless committed after the act."

In 73 AM. JUR. 2d, Statutes, § 422, it is said:

"Where a repealing statute contains a saving clause as to crimes committed prior to the repeal, or as to pending prosecutions, the offender may be tried and punished under the old law. * * *

"Similarly, where amendatory legislation carries a saving clause as to prior offenses * * * the law as it stood at the time of the offenses is applied to the prosecution and sentencing of the violator."

We construe the provision in the 1974 Act, "This act shall become * * * applicable to all offenses hereafter committed" as a saving clause, showing the intent of the Legislature to leave the preexisting statute in effect as to the elements of and punishment for the crime of rape committed prior to 8 April 1974. Otherwise, that provision of the Act would be a mere meaningless redundancy.

In 73 AM. JUR. 2d, Statutes, § 250, it is said:

"In the interpretation of a statute, the legislature will be presumed to have inserted every part thereof for a purpose. Thus, it should not be presumed that any provision of a statute is redundant. The statute should not be construed in such manner as to render it partly ineffective or inefficient if another construction will make it effective. Indeed, it is a cardinal rule of statutory construction that significance and effect should, if possible, without destroying the sense or effect of the law, be accorded every part of the act, including every section, paragraph, sentence or clause, phrase, and word."

In 82 C.J.S., Statutes, § 419, it is said:

"A statute will not be construed to operate retrospectively so as to take away a penalty or condone a crime unless such intention is clearly expressed."

In *State v. Perkins,* 141 N.C. 797, 808, 53 S.E. 735, this Court said:

"It can make no difference how the intention of the Legislature, that an act should have prospective operation, is expressed; whether it is done by unequivocal terms in the act, or by a proviso, or is to be gathered from its general

scope and tenor, so that it appears with sufficient clearness that such is the intention."

In that case and again in *State v. Harvey, supra,* this Court quoted with approval, the following statement from the opinion of the Court of Appeals of Virginia in Pegram's Case, 28 Va. 569:

"A punishment affixed to an offense prior to the first of May, 1828 [the effective date of an amending statute], is not incompatible with a different punishment, either lighter or more severe, affixed to the same offense subsequent to that date. They may well stand together. The punishment prescribed by Laws 1827-'28 being different from that prescribed by Laws 1822-'23, is certainly an implied repeal of it, as to new offenses, from the time it goes into effect; but, by the very terms of the law, the new punishment is only applied to the offenses happening *after* 1 May 1828, leaving the old punishment to be applied to the offenses happening before that day."

In *State v. Harvey, supra,* at page 20, we said:

"The same criminal offenses exist under the Controlled Substance Act as existed under the former Articles 5 and 5A of Chapter 90 of the General Statutes. The provisions for punishment under the new act are different from those contained in the former act. Thus, if the saving clauses contained in G.S. 90-113.7 do not save the punishment provisions of the former act, they are useless and redundant."

We do not perceive how effect can be given to the express declaration that the Act of 1974 "shall become * * * applicable to all offenses hereafter committed," unless it be construed to mean that the Act has no application to offenses committed prior to its effective date, 8 April 1974. We so construe it.

The defendant's remaining Assignments of Error, Nos. 2, 3, 4, 5, 6, 7, 8, 10, 11 and 12 relate to the admission of testimony by various witnesses for the State and to the Solicitor's cross-examination of the defendant's witnesses, Mrs. Williams and Mrs. Barefoot. All of these bits of testimony were trivia. We have carefully considered them all and the surrounding testimony, as shown by the record. We find no error in the rulings of the trial judge, certainly none which could conceivably be deemed to entitle the defendant to a new trial. Had all of these

ten bits of testimony been kept from the jury, it is inconceivable that, in view of the overwhelming mass of evidence as to the perpetration of the offense and the identity of the defendant as the perpetrator of it, the jury would not have reached the same verdict. No useful purpose would be served by a detailed discussion of any of these assignments. They are overruled.

No error.

Chief Justice SHARP dissenting as to the death penalty:

The rape for which defendant was convicted occurred on 16 May 1973, a date during the period between 18 January 1973, the day of the decision in *State v. Waddell*, 282 N.C. 431, 194 S.E. 2d 19, and 8 April 1974, the day on which the General Assembly rewrote G.S. 14-21 by the enactment of Chapter 1201 of the Session Laws of 1973. For the reasons stated by Chief Justice Bobbitt in his dissenting opinion in *State v. Jarrette*, 284 N.C. 625, 666, 202 S.E. 2d 721, 747—an opinion in which Justice Higgins and I joined—, I dissent as to the death sentence imposed upon defendant by the court below and vote to remand for the imposition of a sentence of life imprisonment. *See also* the dissenting opinion of Chief Justice Bobbitt, and my concurrence therein, in *State v. Waddell, supra* at 453 and 476, 194 S.E. 2d at 30 and 47.

I also dissent as to the death penalty in this case for the additional reasons stated below.

Prior to 8 April 1974 the crime of rape was defined and punished by G.S. 14-21 as follows: "§ 14-21. Punishment for rape. —Every person who is convicted of ravishing and carnally knowing any female of the age of twelve years or more by force and against her will, or who is convicted of unlawfully and carnally knowing and abusing any female child under the age of twelve years, shall suffer death: Provided, if the jury shall so recommend at the time of rendering its verdict in open court, the punishment shall be imprisonment for life in the State's prison, and the court shall so instruct the jury."

Section 2 of Chapter 1201, Session Laws of 1973 (quoted below), rewrote G.S. 14-21 to divide rape into two degrees with different punishments.

"§ 14-21. *Rape; punishment in the first and second degree.* —Every person who ravishes and carnally knows any female

State v. Williams

of the age of 12 years or more by force and against her will, or who unlawfully and carnally knows and abuses any female child under the age of 12 years, shall be guilty of rape, and upon conviction, shall be punished as follows:

(a) First-Degree Rape:—

(1) If the person guilty of rape is more than 16 years of age, and the rape victim is a virtuous female child under the age of 12 years, the punishment shall be death; or

(2) If the person guilty of rape is more than 16 years of age, and the rape victim had her resistance overcome or her submission procured by the use of a deadly weapon, or by the infliction of serious bodily injury to her, the punishment shall be death.

(b) Second-Degree Rape—Any other offense of rape defined in this section shall be a lesser-included offense of rape in the first degree and shall be punished by imprisonment in the State's prison for life, or for a term of years, in the discretion of the court."

Under Chapter 1201, only two crimes are now punishable by death, namely, *first* degree murder and *first* degree rape. The death penalty previously provided for arson and first degree burglary was changed to life imprisonment.

In recognition of the fact that the question whether the death penalty can constitutionally be imposed for any crime was then (as now) awaiting a definitive ruling by the United States Supreme Court, the General Assembly provided in Section 7 of Chapter 1201:

"In the event it is determined by the North Carolina Supreme Court or the United States Supreme Court that a sentence of death may not be constitutionally imposed for any capital offense for which the death penalty is provided by this Act, the punishment for the offense shall be life imprisonment."

Section 8 of Chapter 1201 provides:

"This act shall become effective upon ratification and applicable to all offenses hereafter committed."

The rape for which this defendant was convicted falls within the definition of *second* degree rape as defined in Chapter 1201. The resistence of the alleged victim was not overcome,

or her submission procured, by the use of a deadly weapon or by the infliction of serious bodily injury to her. By *serious injury* the General Assembly obviously meant injury *in addition* to the fact of rape, which in itself is serious injury indeed.

Defendant argues that since he could not have been sentenced to death under the present law for the crime for which he was convicted, the court erred in imposing the death sentence. The majority rejects this contention on the ground that Section 8 required the sentence imposed. With that view I cannot agree.

Admittedly, the application to this case of rules of construction which have been employed in certain noncapital cases *(State v. Harvey,* 281 N.C. 1, 187 S.E. 2d 706 (1972) ; *State v. Cameron,* 284 N.C. 165, 200 S.E. 2d 186 (1973) ) would support the majority's conclusion that Section 8 discloses the legislative intent to execute a defendant for a second degree rape committed one day and to imprison another for the same crime committed the following day. I am, however, unwilling to attribute such an intent to the General Assembly. The circumstances surrounding the enactment of Chapter 1201 are not consistent with such an intent.

The sole purpose of rules of construction is to aid the courts in ascertaining the legislative intent. Therefore, no rule, however appropriate in noncapital cases, should bind the Court when dealing with issues of life and death under circumtances such as those of this case.

Prior to the rewriting of G.S. 14-21 in 1974 this Court, in four-to-three decisions, had upheld death sentences for rape in *State v. Jarrette,* 284 N.C. 625, 202 S.E. 2d 721 (1974), and in *State v. Noell,* 284 N.C. 670, 202 S.E. 2d 750 (1974), and in *State v. Henderson,* 285 N.C. 1, 203 S.E. 2d 10 (1974). When these cases were decided, the distinction between *first* degree rape and *second* degree rape as now defined in Chapter 1201 was unknown to our law.

At the time the General Assembly enacted Chapter 1201 on 8 April 1974 it knew the petitions for certiorari by each of the defendants in the four-to-three decisions cited above were pending in the Supreme Court of the United States for the further review of his case, and that execution of the death sentences had been stayed pending action by that Court. Until the United States Supreme Court ruled it could not be finally determined

State v. Williams

whether this Court's decision in *Waddell* had reinstated death as the punishment for the State's four capital crimes or whether the decision in *Furman v. Georgia,* 408 U.S. 238 (1972) had invalidated entirely the death penalty provisions of the statutes which fixed the punishment for those crimes.

Under these circumstances of uncertainty, by the enactment of Chapter 1201, the General Assembly most certainly did three things: (1) It *abolished* capital punishment for arson, burglary in the first degree, and rape in the second degree in the event it should be finally determined that *Waddell* reinstated the death penalty in this State. (2) It *established* capital punishment for murder in the first degree and rape in the first degree in the event the State's death penalty statutes had been abrogated by the decision in *Furman v. Georgia, supra.* (3) It substituted life imprisonment for the death sentence if the Supreme Court of the United States should decide that the latter was constitutionally impermissible.

It seems inconceivable that, under these circumstances, the General Assembly could have intended that any person would thereafter be executed for a crime for which Chapter 1201 abolished the death penalty.

It is doubtful that the General Assembly was aware of any pending case involving *second* degree rape as defined in Chapter 1201. On the other hand, it was aware of the fact that it could not change any *final* decision of this Court in which the death penalty for rape had been upheld. It may be that the purpose of Section 8 was to dispel the unwarranted notion that the General Assembly contemplated *judicial reconsideration* of prior decisions of this Court in which the death penalty for rape had been upheld. This case, however, has not proceeded to final judgment; it is still within the jurisdiction and responsibility of the Court.

In my view to execute a death sentence for a crime which is not now punishable by death would be unconscionable and constitute cruel and unusual punishment in violation of Article I, Section 27, of the Constitution of North Carolina, and of the Eighth Amendment to the Constitution of the United States.

Justice COPELAND dissenting as to death penalty.

With extreme reluctance, I find it necessary to dissent from the affirmance of that portion of the judgment sentencing de-

fendant to death. With all due respect to the present members of this Court who constituted the majority in *State v. Waddell*, 282 N.C. 431, 194 S.E. 2d 19 (1973), and *State v. Jarrette*, 284 N.C. 625, 202 S.E. 2d 721 (1974), I am not of the opinion that the impact of *Furman v. Georgia*, 408 U.S. 238 (1972) on G.S. 14-17 (first degree murder), 14-21 (rape), 14-52 (first degree burglary), and 14-58 (arson), as they were written prior to 8 April 1974, the effective date of Chapter 1201, 1973 Session Laws, was to require the mandatory imposition of death sentences.

Article I, Section 6, of the North Carolina Constitution declares that "[T]he legislative, executive, and supreme judicial powers of the State government *shall be forever separate and distinct from each other.*" (Emphasis supplied.) Under Article XI, Sections 1 and 2, of the North Carolina Constitution, the General Assembly is authorized to provide that the crimes of murder, rape, burglary, and arson, and *only* these crimes, may be punishable by death. Accordingly, I do not believe that the death penalty may be imposed under our State Constitution unless and until our General Assembly so declares it by legislative act. In my opinion, *Furman v. Georgia* did not repeal the discretionary provisions of G.S. 14-17, 14-21, 14-52, and 14-58. What it did was to declare unconstitutional the imposition of the death penalty under those statutes as then written. It did not rewrite those statutes. Therefore, the North Carolina General Assembly, not this Court, was the only constitutional branch of our tripartite system of State Government vested with the authority to redraft those statutes in a manner that would make the imposition of death constitutionally permissible.

In summary, my views on this matter are in complete accord with those expressed by Justice Sharp (now Chief Justice) in her dissenting opinion to *State v. Waddell:*

"In my view, there are no constitutional infirmities in capital punishment *per se* and, under the conditions prevailing today, I do not consider the death penalty cruel and unusual punishment for the crimes for which the State Constitution authorizes the General Assembly to prescribe it. Thus, were I to permit my personal views on capital punishment as a State policy to dictate my decision in this case, I would have voted with the majority. This, however, I am not at liberty to do." 282 N.C. 431, 476, 194 S.E. 2d 19, 47-48.

In this regard, I note that the adjourned session of the 1973 North Carolina General Assembly, presumably in response to *State v. Waddell,* elected to amend all of our capital statutes. Chapter 1201, 1973 Session Laws. This Act, effective 8 April 1974, provides for capital punishment in cases of first degree murder and first degree rape. See G.S. 14-17 and 14-21 (a) (1) and (2). This Act further provides that any person convicted of second degree rape "shall be punished by imprisonment in the State's prison for life, or for a term of years in the discretion of the court." G.S. 14-21 (b). It further provides that any person convicted of burglary in the first degree or of arson "shall be imprisoned for life in the State's prison." G.S. 14-52, 14-58. Section 8 of the Act provides: "This act shall become effective upon ratification *and applicable to all offenses hereafter committed."* (Emphasis added.) I agree with Justice Lake in the majority opinion that the language used in the saving clause is written in clear and explicit terms and that it could not apply to crimes committed prior to 8 April 1974.

It is my firm conviction that the punishments provided for in Chapter 1201, 1973 Session Laws, are constitutionally permissible under both our Federal and State Constitutions. For this reason, I am prepared to apply these laws as written to all the offenses enumerated therein and committed on or after 8 April 1974, the date of ratification.

For the reasons above noted, I dissent as to punishment and vote to remand for the imposition of a sentence of life imprisonment.

Justice EXUM dissenting as to the sentence of death:

While I concur with the majority opinion insofar as it affirms the conviction of the defendant for the crime of rape, I dissent from that portion of the opinion which affirms the judgment imposing a sentence of death. The majority holds that the death sentence can be imposed in this case by virtue of the majority holding in *State v. Waddell,* 282 N.C. 431, 194 S.E. 2d 19 (1973), and Section 8 of Chapter 1201 of the 1973 Session Laws. I disagree with the interpretation given to *Furman v. Georgia,* 408 U.S. 238, 33 L.Ed. 2d 346, 92 S.Ct. 2726 (1972) by the majority in *Waddell* and with the effect given to Section 8.

The majority in *Waddell* correctly interpreted the opinions of five of the United States Supreme Court Justices in *Furman*

to mean that the imposition of the death penalty in North Carolina under our state's then existing capital punishment statutes was unconstitutional. *Waddell* held that all otherwise capital offenses committed in this state before the date of its decision (18 January 1973) were punishable only by life imprisonment. The Superior Court of Sampson County was ordered to sentence the defendant Waddell to life imprisonment.

The question which this Court in *Waddell* then addressed was whether and under what circumstances the death penalty might thereafter be imposed in this state. The majority felt that this Court could make that determination. It held that capital crimes which before *Furman* were punishable by death or life imprisonment were, if committed before *Waddell,* punishable only by life imprisonment, and, if committed after *Waddell,* punishable only by death.

After *Furman* it was, in my opinion, initially for the General Assembly of North Carolina and not this Court to determine as a matter of policy whether and under what circumstances the death sentence should be reinstated in this state. N. C. Const. Art. XI, §§ 1, 2. Before *Waddell* and *Furman* one convicted of a capital crime was sentenced to death unless the jury recommended a sentence of life imprisonment. Thus our legislature, recognizing there would be cases when a person guilty of one of these crimes ought not to suffer death, permitted the jury mercifully to intervene. It has not been the policy of this state since 1949 automatically to execute everyone convicted of a capital crime. *See* 1949 Sess. Laws, Chap. 299, §§ 1-3. The majority of this Court in *Waddell* through its interpretation of *Furman* created such a policy. Only the legislature, in my view, had the prerogative initially to do that.

I agree with the proposition in Justice Lake's concurring opinion in *Waddell,* 282 N.C. at 449, that in the aftermath of *Furman* it was the duty of this Court to determine its effect upon this state's capital punishment laws. I would have concluded, however, that the effect of *Furman* was simply to prohibit the imposition of the death penalty in North Carolina and that only life imprisonment, the other available statutory penalty, could be imposed upon persons convicted of otherwise capital crimes.

The five majority opinions in *Furman* seem to be an effort to restrict, not expand, the circumstances under which the death penalty can be imposed. Indeed Justices Brennan and Marshall

State v. Williams

believe that under no circumstances could its infliction comport with the Eighth Amendment to the United States Constitution. Justice Brennan also wrote:

"[A]lthough 'the death penalty has been employed throughout our history,' *Trop v. Dulles,* 356 U.S., at 99, 2 L.Ed. 2d at 641, in fact the history of this punishment is one of successive restriction. What was once a common punishment has become, in the context of a continuing moral debate, increasingly rare." *Furman v. Georgia, supra,* 408 U.S. at 299, 33 L.Ed. 2d at 383.

Justice White pointed out:

"The short of it is that the policy of vesting sentencing authority primarily in juries—a decision largely motivated by the desire to mitigate the harshness of the law and to bring community judgment to bear on the sentence as well as guilt or innocence—has so effectively achieved its aims that capital punishment within the confines of the statutes now before us has for all practical purposes run its course." 408 U.S. at 313, 33 L.Ed. 2d at 392.

To interpret *Furman* in a way that would, in effect, reverse this trend is contrary to the thrust of the views of a majority of the United States Supreme Court.

Neither do I find the same comfort in Section 8 of Chapter 1201 of the 1973 Session Laws as does the majority. To put this defendant to death for a crime which if committed today could be punished only by imprisonment for life or for a term of years, in the discretion of the trial judge, G.S. 14-21(b), is arbitrary, unconscionable, cruel, and unusual. If the legislature intended by enactment of Section 8 to permit such a result, then this section plainly violates the constitutional prohibitions against cruel and unusual punishment. U. S. Const. Amend. VIII; N. C. Const. Art. I, § 27. These constitutional prohibitions require, in my opinion, that a legislature body which determines to abolish the death penalty for any given crime do so both prospectively and retroactively so that all persons who stand convicted and sentenced for that crime but who have not yet been executed will receive the benefit of the abolition.

I vote to affirm the conviction and to remand this case to the Superior Court of Wake County for the purpose of vacating the sentence of death heretofore imposed and imposing instead a sentence of life imprisonment upon this defendant.