STATE OF NORTH CAROLINA v. CRAWFORD DEAN LOWERY

No. 36

(Filed 14 April 1975)

1. **Criminal Law §§ 34, 169— evidence of another offense — res gestae — similar testimony admitted without objection**
    Defendant in a rape case was not prejudiced by the admission into evidence, over objection, of testimony that defendant engaged in a separate and distinct criminal offense against the person of his victim by participating in the crime against nature perpetrated upon her by defendant's friend, since defendant allowed the same evidence complained of to come in without objection many times during the course of the trial; further, the evidence of the commission of the unnatural sex act, when viewed with the other evidence, tended to exhibit a chain of circumstances in respect to the rape charge and was a part of the *res gestae,* and the evidence was admissible even if defendant had promptly objected at each opportunity.

2. **Criminal Law § 128— failure of court to order mistrial on its own motion — error corrected by striking testimony and instructing jury**
    The trial court did not err in failing to declare a mistrial on its own motion when a State's witness testified, " . . . if the girl had been raped, the guilty person should be prosecuted," since the court sustained defendant's objection, allowed the motion to strike, and instructed the jury not to consider it.

3. **Criminal Law § 162— prejudicial testimony — failure to object — objection waived**
    Defendant in a rape case was not prejudiced by testimony of a witness that the victim had told him that she had studied sociology and the possibility of rape and was advised always to stay calm and try to talk the attacker out of causing her any harm, particularly since defendant did not object to the testimony at trial.

State v. Lowery

4. **Criminal Law § 162— failure to object to evidence at trial — objection waived**

It is well settled that with the exception of evidence precluded by statute in furtherance of public policy, the failure to object to the introduction of the evidence is a waiver of the right to do so, and its admission, even if incompetent, is not a proper basis for appeal.

5. **Criminal Law § 86— cross-examination of defendant as to other offenses — propriety**

A criminal defendant may not be asked if he has been arrested or indicted for a specific offense, but he may, for the purpose of impeachment, be asked if he has committed criminal acts or other specific acts of reprehensible conduct, provided the question is in good faith.

6. **Criminal Law § 86— cross-examination as to subsequent rape — propriety — good faith question**

Where the record in this rape case showed that defendant was in fact indicted at the time of this trial for a subsequent rape of another victim, there was ample basis for the district attorney to ask defendant in good faith whether he committed the offense, and the trial court did not err in failing to declare a mistrial upon its own motion.

7. **Constitutional Law § 36; Rape § 7— death penalty — constitutionality**

Judgment of death in this rape case does not contravene the Eighth and Fourteenth Amendments to the U. S. Constitution.

Chief Justice SHARP and Justices COPELAND and EXUM dissenting as to death sentence.

APPEAL by defendant under G.S. 7A-27(a) from *Clark, J.*, at the June 10, 1974 Criminal Session of ALAMANCE Superior Court.

On an indictment proper in form, defendant was convicted of rape and received the death penalty.

Miss Lynn Snyder, seventeen years of age, testified that on Saturday, 7 July 1973, she returned to her home in Burlington from Carolina Beach about 6:00 p.m. She went to her brother's house nearby around 7:00 or 7:30 p.m. Frank Coots, a friend of several years, was there, and she asked him if he would ride with her to look for Tommy Wilson, a friend she had met at Carolina Beach on prior occasions. She had seen Tommy's mother while at the beach, and his mother had asked her to give him a message when she returned to Burlington. Frank agreed to accompany her.

They went first to the "Footsball" place near the Alamance County Hospital. Wilson was not there. Later, at about 11:00 p.m., they went to a place known as "Choosie Mothers." Miss

Snyder left the car and asked a group of people there if any of them knew Tommy Wilson. Defendant answered that he did and offered to take Miss Snyder and Mr. Coots to find him. Defendant and a friend named Danny Cox entered the back seat of Coots's automobile and Cox described the place to which they were going as the meeting place of the "Zulu Club." The car stopped at a wooded area, and Miss Snyder and defendant got out. Miss Snyder told Coots to stay in the car and defendant told Coots to turn off the headlights. Miss Snyder took about four steps and called Tommy Wilson's name. She then decided that Wilson could not be at a place like this and started to turn around. At this point, defendant held her arm and she felt something sharp in her back. Defendant told her to walk straight or he would kill her.

Defendant led her down a path to a sawdust pile. He then cut off her blouse with a knife and struck her several times about the face. He held a knife to her neck, removed her cut-off jeans and underwear and pushed her back on the sawdust pile. While holding the knife at her throat, and while lying on top of her, he removed his pants with his other hand, and in this position attempted to have intercourse with her. He did manage penetration of one or two inches. She did not give him permission to do so.

At this point, Danny Cox emerged from the woods, saying the police had come. Defendant told Cox he could do anything he wanted with Miss Snyder. Defendant and Cox then dragged her about one hundred feet to the other side of the sawdust pile. Five other males then came over the top of the sawdust pile. Miss Snyder was putting her jeans back on when defendant asked the other boys if they wanted to see her naked, and defendant again pulled off Miss Snyder's jeans. Defendant held one of her arms while the other boys ran their hands over her body, and one of the boys put his mouth on her vagina, at which time she screamed. She was then released and allowed to put her jeans on. Defendant made one of the other boys give her his shirt. Defendant told her that if she opened her mouth about what happened, they would kill her.

Miss Snyder then ran down the path and followed the railroad track until she emerged from the woods. She saw headlights and observed an automobile operated by Officer Helm of the Graham Police Department. She sat in the police car but did not at that time tell Helm what happened because she was

scared and embarrassed to be connected with "those people." She then got back into the car with Frank Coots and on the way home told him to turn around because she wanted to go to the Graham Police Department and tell them what happened. She arrived at the police department about 1:00 a.m. and talked to Officer Helm for a "couple of hours." She had another conversation with Officer Helm later in the day (Sunday, 8 July) in the presence of her mother, her stepfather and attorney. She had a conversation with Mr. Bill Frick, the administrative assistant for the District Attorney, "sometime after" 8 July.

On cross-examination, Miss Snyder testified that she knew dope was used and available at "Choosie Mothers," and that she had smoked pot two years ago. At no time did she ask Frank Coots to accompany her and defendant to the sawdust pile or call for his help. She hesitated to scream because she was afraid she would be killed, but started screaming when one of the boys placed his finger in her rectum. Her vision without glasses is 50-50 and she cannot recognize objects more than four feet away without her glasses. She described the blouse she was wearing as being low-neck and made of flimsy material, and stated that she was not wearing a bra because she was sunburned from the beach.

Mr. Fred Darlington, attorney for the family of Miss Snyder, testified that he was present with Sergeant Helm and members of the Alamance County Sheriff's Department when Miss Snyder identified the defendant as her assailant. On the evening of 8 July he noticed a cut on Miss Snyder's arm and on her upper and lower lip inside her mouth. He testified that Miss Snyder's testimony in court was substantially what she told him during their discussions of the alleged rape.

Sergeant Bobby Helm of the Graham Police Department testified that while on patrol at about 11:45 p.m. on 7 July 1973, he saw Frank Coots in his automobile parked on River Street about 300 to 400 feet south of the sawdust pile. While he was talking to Frank Coots, Miss Snyder emerged from the woods and was crying and upset. She was wearing a green shirt with blood on it and she had blood on her mouth. She told him her name was "Tina" and that she was looking for her friend Tommy Wilson. He could tell she was in no condition to answer questions, so he told her if she wanted to make a statement later to contact the Graham Police Department. She came to the Graham

Police Department at appproximately 2:00 a.m. on 8 July and told officers what happened, and returned about 11:00 p.m. with her mother, stepfather and attorney to make a full statement, which was introduced in evidence and which essentially corroborated Miss Snyder's testimony.

On cross-examination, Sergeant Helm testified that when Miss Snyder emerged from the woods at 12:30 a.m. on the night of the alleged rape, she answered "No" when he asked her if she had been criminally assaulted in any way.

Mr. William W. Frick, administrative assistant for the District Attorney's Office, testified that he interviewed Miss Snyder on 27 September 1973 regarding the circumstances surrounding the alleged rape. Her statement to him was introduced in evidence and essentially corroborated Miss Snyder's testimony.

Dr. Edward B. Sutton, a medical doctor specializing in obstetrics and gynecology, testified that he examined Miss Snyder at 2:55 p.m. on 8 July 1973. No spermatozoa were found in her vagina but spermatozoa might have been washed out since Miss Snyder was in the process of menstruation. He found no bruises or abrasions on her body.

Mark Steven Woods, an acquaintance of defendant, testified that on 7 July 1973 he was a recent initiate of the "Zulu Club," of which defendant was the leader. As an initiation rite he had to fight five individuals at the sawdust pile. He was present when Miss Snyder came to "Choosie Mothers" looking for Tommy Wilson, and heard defendant offer to take her to him. As he entered the car, defendant turned, smiled and said to the others who remained, "Sawdust pile." Defendant then left with Miss Snyder and two others. Shortly thereafter, Woods and four friends left "Choosie Mothers" and went to the sawdust pile. There, Woods saw defendant holding Miss Snyder, who was crying, and saw an individual named "Hoss" commit an oral sex act on her. One or two days later, he heard "Hoss" bragging about committing the oral sex act on Miss Snyder. He also heard defendant say he had tried to put his private parts into Miss Snyder's private parts but could not because she "moved too much and was too tight."

On cross-examination, Mr. Woods stated that he could not see too well in the dark and that he was not positive that "Hoss" was committing an oral sex act.

Defendant testified that he led Miss Snyder to the sawdust pile but at no time threatened her with a knife. At the sawdust pile, he asked her if she was going "to give [him] some." She did not respond but allowed him to place his hand inside her blouse. She removed her blouse and pants. At that time, Danny Cox arrived and said the police were there. At no time did defendant remove his clothing or attempt to place his private parts in hers. The other boys then came and he observed Lee "Hoss" Somers commit an oral sex act on Miss Snyder. When he observed her start to fall, he pushed her back on her feet to keep her from hitting the ground. He did not turn to his friends and say "Sawdust pile" before leaving "Choosie Mothers" with Miss Snyder.

Douglas Ferguson testified for the State that he was present at the sawdust pile on 7 July 1973 and saw a "sharp object" in the hand of defendant. On 9 July 1973, he took police officers to an area near the sawdust pile and showed them Miss Snyder's blouse in some bushes where he had seen defendant drop it after the alleged rape. He stayed in the cell with defendant at the Alamance County Jail the night before his testimony in this trial and defendant told him not to testify against him because " . . . you won't live if you do."

Defendant was recalled and denied that he had threatened Douglas Ferguson.

Other facts pertinent to decision are set out in the opinion.

*Attorney General James H. Carson, Jr. and Assistant Attorney General Claude W. Harris for the State.*

*Donnell S. Kelly for defendant appellant.*

MOORE, Justice.

[1] Defendant first assigns as error the admission into evidence, over objection, testimony that defendant engaged in a separate and distinct criminal offense against the person of Miss Lynn Snyder by participating in the crime against nature perpetrated upon her.

On direct examination, Miss Snyder testified that after defendant raped her Danny Cox arrived and defendant told Cox he could do anything he wanted to with her. She stated further that five other males appeared and defendant again disrobed

---

---

her. All of this was without objection and appears in narrative form.

The following then appears:

"ANSWER BY MISS SNYDER: 'He (defendant) held my arms while another boy held my arm and he gave the boys permission to . . . '

"MR. KELLY: OBJECTION.

"THE COURT: 'THE OBJECTION IS OVERRULED.' "

The record does not set out the question asked nor does it disclose any objection to the question.

After this there is another narrative paragraph where Miss Snyder testified that the defendant held one of her arms and told the other boys that they could do anything they wanted to do with her and that one of the boys put his mouth on her vagina. No objection or motion to strike appears.

1 Stansbury's N. C. Evidence § 27, pp. 69-70 (Brandis Rev. 1973), states:

" . . . In case of a specific question, objection should be made as soon as the question is asked and before the witness has time to answer. Sometimes, however, inadmissibility is not indicated by the question, but becomes apparent by some feature of the answer. In such cases the objection should be made as soon as the inadmissibility becomes known, and should be in the form of a motion to strike out the answer or the objectionable part of it. . . . "

This was not done. The record further discloses that the same evidence complained of came in without objection many times during the course of the trial, and on some occasions in response to questions by defendant's counsel.

On cross-examination, Miss Snyder stated that defendant and another boy held her arms while the other boys kissed and fondled her and while one of them committed the unnatural sex act on her.

Without objection, Officer Helm and Investigator Frick, in corroboration, testified as to Miss Snyder's statements to them regarding the unnatural sex act.

State v. Lowery

Mark Steven Woods, an eyewitness, told the same story without objection.

Defendant himself told of this act but claimed that Miss Snyder was falling to the ground and that all he did was push her up.

The well established rule is that when evidence is admitted over objection, but the same evidence has theretofore or thereafter been admitted without objection, the benefit of the objection is ordinarily lost. 1 Stansbury's, *supra*, § 30; *State v. Little,* 278 N.C. 484, 180 S.E. 2d 17 (1971) ; *State v. Owens,* 277 N.C. 697, 178 S.E. 2d 442 (1971) ; *State v. Jarrett,* 271 N.C. 576, 157 S.E. 2d 4 (1967). Defendant here allowed similar evidence without objection and therefore lost the benefit of the objection.

Further, under the facts of this case we think the evidence was admissible even if defendant had promptly objected at each opportunity. Ordinarily, the State cannot offer proof of another crime independent of and distinct from the crime for which the defendant is being prosecuted even though the separate offense is of the same nature as the crime charged. 1 Stansbury's *supra,* § 91; *State v. Humphrey,* 283 N.C. 570, 196 S.E. 2d 516 (1973) ; *State v. Atkinson,* 275 N.C. 288, 167 S.E. 2d 241 (1969) ; *State v. McClain,* 240 N.C. 171, 81 S.E. 2d 364 (1954). Such evidence is competent, however, to show " ' . . . the *quo animo,* intent, design, guilty knowledge, or scienter, or to make out the *res gestae,* or to exhibit a chain of circumstances in respect of the matter on trial, when such crimes are so connected with the offense charged as to throw light upon one or more of these questions. [Citations omitted.]' " *State v. Jenerett,* 281 N.C. 81, 89, 187 S.E. 2d 735, 740 (1972), quoting from *State v. Atkinson, supra. See* 1 Stansbury's, *supra,* § 92.

The evidence tends to show that when the defendant left the footsball place with Miss Snyder, he turned to several other males, smiled, and said, "Sawdust pile." Several other males arrived at the sawdust pile shortly after the alleged rape, and Lee "Hoss" Somers, with the aid of defendant, committed the unnatural sex act on Miss Snyder. We think the evidence of commission of the unnatural sex act, when viewed with other evidence, tended to exhibit a chain of circumstances in respect to the rape charge, and was a part of the *res gestae.* The evidence was properly admitted. This assignment is overruled.

**[2]** Defendant next contends that the trial court erred in failing to declare a mistrial on its own motion when the State's witness, Mr. Darlington, testified as follows:

"QUESTION BY MR. PIERCE: What was your interest in the matter?

"ANSWER BY MR. DARLINGTON: I have a daughter myself and they are close friends of mine and I felt if the girl had been raped, the guilty person should be prosecuted.

"MR. KELLY: Your Honor, we OBJECT and move the answer be stricken.

"THE COURT: SUSTAINED, MOTION ALLOWED, and I instruct the jury not to consider that."

No motion for a mistrial was made. Defendant elected to proceed with the trial and to take his chances with the jury then impaneled. Under these circumstances he may not successfully contend that the court, of its own motion, should have declared a mistrial. ". . . Indeed, without defendant's consent or a motion by him, had the court declared a mistrial, *ex mero motu,* at the onset of the next trial the judge would most certainly have been confronted with defendant's plea of former jeopardy. [Citations omitted.]" *State v. Moore,* 276 N.C. 142, 150, 171 S.E. 2d 453, 458 (1970). " . . . It is only in cases of necessity in attaining the ends of justice that a mistrial may be ordered in a capital case without the consent of the accused. [Citations omitted.]" *State v. Harris,* 223 N.C. 697, 700, 28 S.E. 2d 232, 235 (1943). *Accord, State v. Moore, supra; State v. Crocker,* 239 N.C. 446, 80 S.E. 2d 243 (1954). Here, the court sustained the objection, allowed the motion to strike, and instructed the jury not to consider it. We do not believe that this generalized statement made by Mr. Darlington that *"if* the girl had been raped, the guilty party should be prosecuted" (emphasis added) was so inherently prejudicial that its initial impact was not erased by the judge's prompt and emphatic instruction that the jury should not consider it. As Justice Devin (later Chief Justice) said in *State v. Ray,* 212 N.C. 725, 729, 194 S.E. 482, 484 (1938):

"[O]ur system for the administration of justice through trial by jury is based upon the assumption that the trial jurors are men of character and of sufficient intelligence to fully understand and comply with the instructions

of the court, and are presumed to have done so. [Citation omitted.]"

*Accord, Highway Comm. v. Helderman,* 285 N.C. 645, 207 S.E. 2d 720 (1974) ; *State v. Moore, supra.* This assignment is overruled.

[3] Defendant next assigns as error the admission into evidence the testimony of the witness Frick that the prosecuting witness in her statement to him said : ". . . [S]he had taken sociology in school and in taking this course they had studied the possibility of rape cases and so forth, and was advised to always stay calm and to attempt to talk the attacker out of causing her any harm and to try to save her life or from getting beat up or scarred for life." The record does not disclose that the defendant made any objection to the testimony of this witness.

[4] It is well settled that with the exception of evidence precluded by statute in furtherance of public policy, which exception is not applicable to this assignment of error, the failure to object to the introduction of the evidence is a waiver of the right to do so, and its admission, even if incompetent, is not a proper basis for appeal. 1 Strong, N. C. Index 2d, Appeal and Error § 30 (1967) ; *State v. Gurley,* 283 N.C. 541, 196 S.E. 2d 725 (1973) ; *State v. McKethan,* 269 N.C. 81, 152 S.E. 2d 341 (1967) ; *State v. Howell,* 239 N.C. 78, 79 S.E. 2d 235 (1953). " . . . It is too late after the trial to make exceptions to the evidence. [Citations omitted.]" *State v. Howell, id.* at 81-82, 79 S.E. 2d at 237. We do not believe this innocuous statement prejudicial. This assignment is overruled.

[5, 6] Next, defendant assigns as error the failure of the trial court to declare upon its own motion a mistrial after the following question was asked by the district attorney of the defendant on cross-examination: "On April 5, 1974, didn't you insert your private parts into Kathy Cox?" The court then said, "When?" When told "April 5, 1974," the court sustained the objection. The trial court's ruling was error in favor of defendant. Defendant concedes that under the rule in *State v. Williams,* 279 N.C. 663, 185 S.E. 2d 174 (1971), the solicitor properly asked this question. In *Williams,* it is stated:

"It is permissible, for purposes of impeachment, to cross-examine a witness, including the defendant in a criminal case, by asking disparaging questions concerning col-

lateral matters relating to his criminal and degrading con-
duct. [Citations omitted.] Such questions relate to matters
*within the knowledge of the witness,* not to accusations of
any kind made by others. We do not undertake here to mark
the limits of such cross-examination except to say generally
(1) the scope thereof is subject to the discretion of the
trial judge, and (2) the questions must be asked in good
faith." *Id.* at 675, 185 S.E. 2d at 181.

A criminal defendant may not be asked if he has been arrested
or indicted for a specific offense, but he may, for the purpose of
impeachment, be asked if he has committed criminal acts or
other specific acts of reprehensible conduct, provided the ques-
tion is in good faith. *State v. Gainey,* 280 N.C. 366, 185 S.E.
2d 874 (1972) ; *State v. Williams, supra.* The record shows
that defendant was in fact indicted at the time of this trial for
the rape of Kathy Cox on April 5, 1974; hence, there was ample
basis for this question to be asked in good faith. This assign-
ment is without merit.

Finally, defendant contends that the judgment imposing
the death penalty contravenes the Eighth and Fourteenth
Amendments to the Constitution of the United States.

[7] The questions raised by the defendant have been raised in
a number of recent cases before the Supreme Court of North
Carolina. The answer in each is that the judgment of death does
not contravene the Eighth and Fourteenth Amendments. *See
State v. Fowler,* 285 N.C. 90, 203 S.E. 2d 803 (1974) ; *State v.
Dillard,* 285 N.C. 72, 203 S.E. 2d 6 (1974) ; *State v. Crowder,*
285 N.C. 42, 203 S.E. 2d 38 (1974) ; *State v. Jarrette,* 284 N.C.
625, 202 S.E. 2d 721 (1974) ; *State v. Waddell,* 282 N.C. 431,
194 S.E. 2d 19 (1973). We adhere to our decisions in those cases.

It is noted that the court's charge was not brought forward
in the record. Therefore, it is presumed that the jury was clearly
charged as to the law arising upon the evidence as required by
G.S. 1-180. 3 Strong, N. C. Index 2d, Criminal Law § 158
(1967) ; *State v. Moore, supra; State v. Cooper,* 273 N.C. 51,
159 S.E. 2d 305 (1968).

We have carefully reviewed the entire record in this case
and have considered every contention and argument advanced
by defendant. Our examination discloses that defendant received
a fair trial, free from prejudicial error.

No error.

Chief Justice SHARP dissenting as to the death penalty:

The rape for which defendant was convicted occurred on 7 July 1973, a date between 18 January 1973, the day on which the opinion in *State v. Waddell,* 282 N.C. 431, 194 S.E. 2d 19, was filed and 8 April 1974, the day on which the 1973 General Assembly rewrote G.S. 14-21 at its second session by the enactment of Ch. 1201, Sec. 2, N. C. Sess. Laws (1973). For the reasons stated in the dissenting opinion of Chief Justice Bobbitt in *State v. Jarrette,* 284 N.C. 625, 666, 202 S.E. 2d 721, 747 (1974), an opinion in which Justice Higgins and I joined, I dissent as to the death sentence and vote to remand for the imposition of a sentence of life imprisonment. *See also* the dissents in *State v. Waddell, supra* at 453 and 476, 194 S.E. 2d at 30 and 47.

Justice COPELAND dissents as to death sentence and votes to remand for imposition of a sentence of life imprisonment for the reasons stated in his dissenting opinion in *State v. Williams,* 286 N.C. 422 at 437, 212 S.E. 2d 113 at 122 (1975).

Justice EXUM dissents from that portion of the majority opinion which affirms the death sentence and votes to remand this case in order that a sentence of life imprisonment can be imposed for the reasons stated in his dissenting opinion in *State v. Williams,* 286 N.C. 422, 212 S.E. 2d 113 (1975).