STATE OF NORTH CAROLINA v. VERNON JUNIOR WOODS

No. 13

(Filed 14 April 1975)

1. **Jury § 7—peremptory challenges — number allowed in capital case**

In a prosecution of defendant for kidnapping, rape and murder, the trial court erred in allowing the State twenty-two peremptory challenges and defendant thirty-four since G.S. 9-21 allowed the State only nine jurors and defendant fourteen jurors "and no more" in a capital case; however, such error was harmless and not so prejudicial as to require a new trial.

2. **Criminal Law § 84; Searches and Seizures § 2— engagement ring and wedding band given to officers — no search by officers**

In a prosecution for rape, murder and kidnapping, the trial court did not err in allowing into evidence an engagement ring and a wedding band allegedly belonging to defendant's victim where the evidence tended to show that two officers talked to defendant's wife at the police station in the presence of her mother, the wife was asked about the rings and was persuaded by her mother to give the rings to the officers, and thereafter took her mother and the officers to her trailer home where she unlocked the door and led the two officers and her mother to her bedroom where she picked up a pair of her blue jeans and took from the pocket the two rings in question and gave them to the officers, no search or further inquiry was made at the trailer, the officers were inside the trailer less than two minutes, the rings given to the officers by defendant's wife had been given to her by defendant on the day the offenses were committed, and the rings were the wife's and were in her possession.

State v. Woods

3. **Searches and Seizures § 1— warrantless seizure and impoundment of vehicle — no abridgment of rights**

　　Defendant's rights were not abridged by the warrantless seizure, impoundment, and subsequent search pursuant to a warrant of his automobile where officers observed defendant driving an automobile which they had probable cause to believe had been involved in the kidnapping, rape and murder of deceased, and officers believed that, if the automobile was not seized and impounded, the wife of the defendant would likely attempt to destroy or make unusable any evidence therein or any evidence in the car could be tainted and considered unreliable in the minds of the jury and perhaps even made inadmissible because of intervening uncontrolled access to the car by persons other than defendant.

4. **Criminal Law § 43— staged photographs — admissibility for illustration only**

　　In a kidnapping, rape and murder prosecution, the trial court did not err in allowing into evidence photographs staged with witnesses and with the automobiles of the alleged victim and of the defendant where the photographs were admitted for illustrative purposes only, the jury was instructed as to their limited purpose, and the jury was thoroughly informed that the photographs were posed or staged.

5. **Criminal Law § 66— in-court identification of defendant — observation at crime scene as basis**

　　Findings of fact by the trial court that a witness had an opportunity to observe defendant and his victim on the day of the crime and that the in-court identification of the defendant by the witness was based on that observation and not on photographs shown him by police officers were supported by the evidence and are conclusive on appeal.

6. **Criminal Law § 33— inability of witness to identify driver of vehicle — relevancy of testimony**

　　In a prosecution for kidnapping, rape and murder where the State relied on circumstantial evidence, the trial court did not err in allowing into evidence testimony of a witness who was unable to identify with certainty an automobile or its occupants, since the testimony was relevant in that it placed a male driver in a light green Chevrolet operating the vehicle on the wrong side of the road on the morning that the offenses were committed, and other evidence tended to show that defendant owned a light green 1967 Chevrolet and that the victim's body was found in that vicinity the next day.

7. **Criminal Law § 113— alibi instruction — failure to request**

　　Defendant was not entitled to an instruction on alibi where he failed to make a request therefor.

8. **Homicide § 30— felony-murder — no submission of lesser included offense of second degree murder**

　　In a first degree murder prosecution where there was no evidence that suggested deceased was killed other than in the perpetration or attempted perpetration of the felonies of kidnapping and rape, the

trial court did not err in failing to instruct the jury on the question of defendant's guilt of the lesser included offense of second degree murder.

9. **Kidnapping § 1; Homicide § 21; Rape § 5— first degree murder following kidnapping and rape — sufficiency of evidence**

In a kidnapping, rape and first degree murder prosecution, evidence was sufficient to survive defendant's motion for directed verdict and the case was properly submitted to the jury where the State's evidence tended to show that numerous witnesses saw defendant in downtown Lenoir around 9:00 a.m. on 11 August 1973 driving a light green Chevrolet with a dark top, several women testified that they were approached by defendant on this morning, there was testimony that a man and a woman were seen scuffling in the parking lot where deceased's car was parked and that deceased was shoved into defendant's car, a car like defendant's carrying two occupants and with a male driver was seen about an hour and twenty minutes later on the wrong side of the road in the vicinity of a stream where the victim's body was found the next day, the victim had live spermatozoa in her vagina, her vagina and rectal area had been injured and there was a tear in the peritoneum, rings identified as belonging to the victim were given by the defendant to his wife on the afternoon of 11 August, a torn portion of an insurance identification card was found in the 1967 Chevrolet operated by defendant, this torn portion matched the other portion of the card found with the personal effects of the deceased, and fibers found in the 1967 Chevrolet matched fibers from the dress worn by the deceased on 11 August.

10. **Criminal Law § 26; Homicide § 31— felony-murder — separate punishment for felony — error**

In a prosecution for kidnapping, rape and first degree murder, the trial court erred in overruling defendant's motion to arrest the judgments entered in the kidnapping and rape cases since proof of rape or kidnapping was an indispensable element in the State's proof of murder in the first degree, and therefore neither rape nor kidnapping afforded basis for additional punishment under the merger rule.

11. **Criminal Law § 55— bloodstain in kidnapping vehicle — failure to show type — probative value**

When considered with other circumstances shown by the evidence in a kidnapping, rape and murder prosecution, the fact that there was a human bloodstain on the seat cover of the automobile alleged to have been utilized in the kidnapping of deceased and driven by defendant on the morning of 11 August 1973 was highly probative of a material fact, and the fact that the State could not show the blood type went to the weight of the evidence and not to its admissibility.

12. **Criminal Law § 50— expert testimony as to cloth fibers — statement not within field of expertise — no error**

The trial court did not err in allowing an expert witness to testify concerning his examination of fibers from a kidnapping, rape and

State v. Woods

murder victim's dress, his examination of fibers seized in a search of defendant's vehicle, his expert opinion as to the similarity of the fibers, and his opinion that the red fibers were reasonably rare and that it was unlikely that the fibers came from a source other than the dress of the victim; the further statement by the witness on cross-examination that it was also unlikely that two women might own the same dress was inconsequential and not prejudicial to defendant.

13. **Homicide §§ 4, 12— felony-murder — kidnapping not listed in statute — kidnapping within purview of statute**

The trial court properly denied defendant's motions to quash the bills of indictment made on the ground that the felony-murder doctrine under which the State elected to proceed was unconstitutionally vague in that kidnapping was not listed in G.S. 14-17 at the time of the offense as one of the felonies that would support a conviction under the felony-murder rule, since, prior to the amending of G.S. 14-17 to add kidnapping to the list of specified felonies, it was well established that any felony inherently dangerous to life was within the purview of G.S. 14-17 though not specified therein; furthermore, rape was listed in G.S. 14-17 at the time of the alleged murder as one of the felonies that would support a conviction under the felony-murder rule, and either kidnapping or rape would support a conviction under this rule.

14. **Constitutional Law § 36; Homicide § 31— first degree murder — mandatory death sentence proper**

Imposition of the mandatory death sentence in this first degree murder case did not violate defendant's rights under the Eighth and Fourteenth Amendments to the U. S. Constitution.

Chief Justice SHARP and Justices COPELAND and EXUM dissenting as to death sentence.

ON *certiorari* to review the trial before *Thornburg, J.*, at the 21 January 1974 Session of Catawba Superior Court. Defendant initially appealed, but the transcript was not available to perfect the appeal within the time allowed. Defendant petitioned for a writ of *certiorari*, which we allowed on 8 May 1974.

On indictments proper in form, defendant was convicted of kidnapping, rape and first degree murder, and received life imprisonment for kidnapping and the death penalty for both rape and first degree murder.

The evidence for the State tends to show: On Saturday, 11 August 1973, shortly after 8:30 a.m., Mrs. Paula Gail Bowman Hollar left the home of her parents where she and her husband Steven Hollar were living. Although due at work at a photography studio in Lenoir at 9:00 a.m., she did not arrive there. However, her 1973 yellow Pontiac was found later that

day in the parking lot where she usually parked it during working hours.

On the afternoon of 12 August, Charles B. Taylor of Lenoir was viewing some of his property on Old Mill Creek Road about three quarters of a mile from Lenoir when he found Mrs. Hollar's nude, lifeless body partially submerged in a small creek nearby.

Dr. John Daly, the State Medical Examiner, performed an autopsy the next day. Paula had been dead at that point between 24 and 72 hours, in his opinion. She had abrasions and bruises on her mouth, neck, arm, back, anus, and vaginal area. There was a three millimeter perforation of the peritoneum which, in the opinion of Dr. Daly, was a manifestation of blunt trauma in the anus. Fresh intact spermatozoa were found in deceased's vagina. The cause of death was blunt trauma to the head.

Onis Miller, who operated a service station in Lenoir, talked to defendant for about five or ten minutes between 6:30 a.m. and 8:00 a.m. on 11 August regarding repairs to defendant's automobile. It appeared to Miller that defendant had been drinking and Miller saw a fifth-size bottle of liquor in the floorboard of defendant's automobile.

Mrs. Violet Price was parking at her place of employment in Lenoir at about 7:45 a.m. on 11 August when defendant pulled in beside her, got out, opened her door, and asked, "What's your name?" She answered, "Get away from my car." Defendant then said, "I'm sorry, I thought you were my wife," and drove away. Mrs. Price was eight and one-half months pregnant at the time.

Mrs. Agnes Ruppert was walking to the post office about 8:40 a.m. on 11 August when defendant, in a light-green Chevrolet with a dark vinyl top, pulled into the curb and began yelling to her and motioning to her to come to him. She recognized him since he had accompanied his wife on several occasions while his wife was being fitted for contact lenses at Mrs. Ruppert's place of employment. Mrs. Ruppert continued to the post office and defendant drove away.

Mrs. Shirley Watson was parking her automobile for a visit to the beauty shop around 7:30 a.m. to 7:45 a.m. on 11 August when defendant drove into the parking lot and began staring at her. He stared at her until she went into the beauty shop.

State v. Woods

Mrs. A. F. Lupes was parked outside her house in Lenoir waiting for a girl who works for her mother at about 8:05 a.m. on 11 August when defendant stopped beside her and honked his horn. Mrs. Lupes thought defendant wanted to enter a driveway that she was blocking so she backed up. Defendant then pulled into a parking lot across the street and motioned for her to come to his automobile. Mrs. Lupes drove away and came to a stop at a red stoplight down the street. Defendant, who had followed her, stopped his car, got out, and walked to the driver's side of Mrs. Lupes's vehicle. He told her to stop at a parking lot and to wait for him because he wanted to talk to her. When the light changed, she drove directly home and told her husband.

James L. Cline was walking in Lenoir on 11 August shortly before 9:00 a.m. As he emerged from an alley which served as a short cut to his destination, he saw the victim's Pontiac and defendant's 1967 light-green Chevrolet with a black vinyl top parked across the street in the lot where deceased's car was found. The automobiles were about twenty feet apart. He saw defendant with his arm around the neck of deceased. They were about three feet from the victim's Pontiac. Defendant took her to the Chevrolet, opened the door, and shoved her into the front seat. Cline did not see her head above the seat after that.

Judge A. R. Crisp was walking to the post office about 8:50 a.m. on 11 August when he heard a short blast from the horn of an automobile parked in the lot where deceased's Pontiac was found. He saw the back of a young woman apparently being held down by someone. At the time he was about ten feet away. He did not see any faces. He remembered seeing only one car. He assumed they were two youngsters "carrying on," and did nothing to aid the girl at that time.

Paul Seagle was waiting at a red light in Lenoir shortly before 9:00 a.m. on 11 August and saw a man and woman sitting in a light-colored Pontiac at the parking lot in question. The man's arms were around the woman. It was the same Pontiac he had often seen parked there.

Mr. Jessie C. Watson was also waiting for the light near the parking lot to change "somewhere before 9:00 a.m." on 11 August. He saw a man standing beside a light-colored automobile with his right arm around a girl's neck and his left hand over her face around her mouth.

Mrs. Louise H. Wilcox was driving on Hibriten Drive about 10:20 a.m. on 11 August. As she approached the intersection of Hibriten Drive and Old Mill Creek Road, a 1967 light-green Chevrolet approached her from the other direction in her lane of traffic. The car was occupied by two people. Mrs. Wilcox stopped completely and the Chevrolet turned down Old Mill Creek Road.

There was also testimony that defendant gave three rings to his wife sometime during the afternoon of 11 August. One was an engagement ring, another was a wedding band, and another was a 1972-1973 high school ring. Two of the rings were identified by the deceased's husband and the jeweler who sold them to him as belonging to deceased. Defendant told his wife that he had won the rings in a poker game the night before. The wedding and engagement rings were introduced into evidence at the trial. The high school ring was never recovered.

The State further offered expert testimony that tended to show that certain fibers found in defendant's 1967 Chevrolet automobile matched fibers from the dress worn by the victim on 11 August, and that a portion of an identification card found in the Chevrolet matched a larger portion of the identification card found in the victim's wallet in the creek where her clothing was found.

Defendant's evidence tended to show that defendant was at his sister's house south of Lenoir from 7:00 a.m. to 7:40 a.m. and again about 10:00 a.m. on 11 August 1973. That he stayed there for about fifteen minutes and seemed to be normal. His mother saw him that afternoon and he appeared normal.

Defendant did not testify.

Other facts pertinent to decision are set out in the opinion.

*Attorney General Rufus L. Edmisten by Assistant Attorney General Sidney S. Eagles, Jr. for the State.*

*John H. McMurray and Bruce W. Vanderbloemen for defendant appellant.*

MOORE, Justice.

[1] Defendant first assigns as error the action of the trial court in allowing the State to challenge peremptorily without cause more than nine jurors. It was stipulated that the State

peremptorily excused eleven jurors and the record shows that the defendant peremptorily excused thirteen. The trial court ruled that the State had twenty-two peremptory challenges and that the defendant had thirty-four.

Defendant was charged with two capital crimes and one non-capital.

G.S. 9-21 in part provides:

"(a)  In all capital cases each defendant may challenge peremptorily without cause 14 jurors and no more. In all other criminal cases each defendant may challenge peremptorily six jurors without cause and no more. . . .

"(b)  In all capital cases the State may challenge peremptorily without cause nine jurors for each defendant and no more. In all other criminal cases the State may challenge peremptorily without cause four jurors for each defendant and no more. . . . "

The trial judge allowed the State nine peremptory challenges in each capital case and four in the kidnapping case, for a total of twenty-two. Defendant was allowed fourteen in each capital case and six in the kidnapping case, for a total of thirty-four. This was error. Under the express provisions of the statute in all capital cases the defendant may challenge fourteen jurors and the State may challenge nine jurors *"and no more."* (Emphasis added.) *See State v. Alridge,* 206 N.C. 850, 175 S.E. 191 (1934). In the present case, however, we think this error is harmless.

It is well established that the system by which juries are selected does not include the right of any party to select certain jurors but to permit parties to protect themselves against prejudice by allowing them to exclude unacceptable jurors. Defendant has no vested right to a particular juror. *State v. Honeycutt,* 285 N.C. 174, 203 S.E. 2d 844 (1974) ; *State v. Atkinson,* 275 N.C. 288, 167 S.E. 2d 241 (1969). The right of peremptory challenge is not a right to select but to exclude. *State v. Allred,* 275 N.C. 554, 169 S.E. 2d 833 (1969) ; *State v. Banner,* 149 N.C. 519, 63 S.E. 84 (1908). Defendant did not exhaust the fourteen peremptory challenges given him by the statute and was not in any respect denied his right to exclude prospective jurors unacceptable to him.

As was said by Chief Justice Stacy in *State v. Koritz,* 227 N.C. 552, 555, 43 S.E. 2d 77, 80 (1947) :

" . . . To present an exception on rulings to challenges to the polls, the appellant is required to exhaust his peremptory challenges and then undertake to challenge another juror. *Oliphant v. R. R.,* 171 N.C., 303, 88 S.E., 425. The court's action in the matter must be hurtful and its effect unavoidable before it will be held to vitiate the trial. *S. v. Cockman,* 60 N.C., 484; *S. v. Benton,* 19 N.C., 196.

"The trial court was at pains to see that every opportunity was afforded for the selection of a fair and impartial jury. The defendants would be entitled to no more on a new trial, and this they have already had. *S. v. Levy,* 187 N.C., 581, 122 S.E., 386; *S. v. Sultan,* 142 N.C., 569, 54 S.E., 841; *S. v. English,* 164 N.C., 497, 80 S.E., 72; *S. v. Bohanon,* 142 N.C., 695, 55 S.E., 797. Their right is not to select but to reject jurors. Having been tried by twelve jurors who were unobjectionable to them, the defendants have no valid ground to urge that they have been prejudiced by the composition of the jury. *S. v. Pritchett,* 106 N.C., 667, 11 S.E., 357; *S. v. Hensley,* 94 N.C., 1021."

Although it was error for the trial court to allow the State more than nine peremptory challenges and to allow the defendant more than fourteen, we hold that this error was harmless and not so prejudicial as to require a new trial. *See* 3 Strong, N. C. Index 2d, Criminal Law § 167, p. 126, and cases cited therein. This assignment is overruled.

[2] Defendant next assigns as error the denial of his motion to suppress the evidence and receiving into evidence State's Exhibits Nos. 6 and 7, an engagement ring and a wedding band. He contends that his constitutional rights under the Fourth and Fourteenth Amendments to the Constitution of the United States were violated in that this evidence obtained by the officers was without the authorization of a valid search warrant and that evidence obtained in such a manner is incompetent under G.S. 15-27, the federal exclusionary rule, and federal and state decisions dealing with non-consensual searches conducted without search warrants.

To support this position, defendant cites *State v. Hall,* 264 N.C. 559, 142 S.E. 2d 177 (1965). The facts in *Hall* were briefly as follows: Defendant was in jail and officers both from North Carolina and Virginia knew this. They did not request defendant's permission to search his home but went to the home, confronted defendant's wife, identified themselves as police officers, and asked for the privilege of searching the house. There was some question as to the extent the officers left the wife free to consent to the search, or whether the number of officers had a coercive effect sufficient to make her consent involuntary. A search of the house by the officers turned up a clock and a radio which were later identified as belonging to the store in Edenton, North Carolina, which had been robbed. The officers then confronted the defendant with those items, at which time he confessed to the breaking and entering and larceny. This Court held that the possession of the radio and clock was unlawfully obtained by the officers and the items were improperly admitted in evidence. The facts in the present case clearly distinguish it from *Hall.*

Here, there were but two officers who talked to Mrs. Woods at the police station in the presence of her mother. Mrs. Woods was asked about the rings and was persuaded by her mother to give the rings to the officers. She thereafter took her mother and the officers to her trailer home where she unlocked the door and led the two officers and her mother to her bedroom where she picked up a pair of her blue jean pants and took from the right side pocket of these pants the two rings in question and gave them to the officers. No search or further inquiry was made at the trailer. The officers were inside the trailer less than two minutes. The rings given to the officers by Mrs. Woods had been given to her by her husband on 11 August 1973. The rings were hers and were in her possession.

It is well settled that evidence obtained by unreasonable searches and seizures is inadmissible. Fourth, Fifth and Fourteenth Amendments to the United States Constitution; Article I, Section 20, of the North Carolina Constitution; G.S. 15-27 (repealed effective July 1, 1975, by Chapter 1286, Section 26, 1973 Session Laws) ; *Mapp v. Ohio,* 367 U.S. 643, 6 L.Ed. 2d 1081, 81 S.Ct. 1684 (1961) ; *State v. Reams,* 277 N.C. 391, 178 S.E. 2d 65 (1970) ; *State v. Colson,* 274 N.C. 295, 163 S.E. 2d 376 (1968). It is also well settled that the constitutional guaranty against unreasonable searches and seizures does not pro-

---

---

hibit a seizure of evidence without a warrant where no search is required. *U. S. v. Pate,* 324 F. 2d 934 (7th Cir. 1963), *cert. den.* 377 U.S. 937, 12 L.Ed. 2d 299, 84 S.Ct. 1341 (1964); *State v. Reams, supra; State v. Virgil,* 276 N.C. 217, 172 S.E. 2d 28 (1970).

Quoting with approval from *State v. Coolidge,* 106 N.H. 186, 208 A. 2d 322, this Court in *Reams, supra,* at 398, 178 S.E. 2d at 69, stated:

> " 'A search ordinarily implies a quest by an officer of the law, a prying into hidden places for that which is concealed. A seizure contemplates forcible dispossession of the owner. *Weeks v. United States,* 232 U.S. 383, 397, 34 S.Ct. 341, 58 L.Ed. 652; *United States ex rel Stacey v. Pate,* 324 F. 2d 934, 935 (7th Cir. 1963); [other citations omitted.]' "

The evidence in the instant case amply supports the trial judge's findings of fact:

> "That Mrs. Woods had a legal right to enter the trailer premises on the occasion when she did so with her mother and the officers. That the officers performed no search on the premises.

> "That the interrogation was not extensive in duration. That Mrs. Woods was not coerced by the officers into producing the rings and in fact made no effort to do so until requested by her mother to cooperate with the officers. That she was under no duress, restraint or coercion at the time she agreed to go to the trailer."

These facts sustained the trial judge's conclusions of law that "there was no unreasonable search of the premises occupied by the defendant and his wife at the time the rings were obtained, and second, that the rings were legally obtained from Mrs. Woods who voluntarily, knowingly, understandingly and intentionally turned over their possession to the officers."

We hold, therefore, that no search was involved, and that Mrs. Woods voluntarily turned the rings over to the officers. They were properly admitted into evidence. This assignment of error is overruled.

[3] Defendant next contends that his rights under the Fourth Amendment to the Constitution of the United States, as applied

State v. Woods

to the states by the Fourteenth Amendment, were violated by the unreasonable search and seizure of the automobile in question.

In the instant case, as defendant and his wife were driving their car they were stopped by police officers who took defendant to police headquarters for questioning. The officers had no arrest warrant and no search warrant.

While defendant was being taken to police headquarters, the 1967 Chevrolet and his wife were driven by an officer to headquarters also. Once there, the car was impounded and thereafter a search warrant for the car was issued and served on the defendant and on his wife before any search of it was made.

Defendant contends that the officers had no reasonable grounds for a warrantless arrest and, since he was not arrested when he was taken in for questioning, the seizure of the automobile at that time without a search warrant was unconstitutional and that all evidence seized from the car and all testimony which referred to the evidence found in the car should have been suppressed.

It is not necessary to decide whether defendant was arrested at the time he was requested by the officers to accompany them to the police station to answer questions. The officers then had probable cause to believe that defendant had committed three serious felonies—kidnapping, rape, and murder—and was likely to evade arrest if not immediately taken into custody. An arrest then would have been proper. G.S. 15-41 (repealed effective July 1, 1975, by Chapter 1286, Section 26, 1973 Session Laws).

While he was at the police station, defendant was formally arrested and proper warrants charging the three felonies were served on him. The car was impounded and was not searched until a search warrant was procured and served. Defendant contends, however, that the original seizure of the automobile was unreasonable and without a warrant and that any evidence obtained therefrom was inadmissible. Unreasonable searches and seizures are prohibited by both the Constitution of the United States and the Constitution of North Carolina, and all evidence obtained by searches and seizures in violation of the Constitution is inadmissible in both state and federal courts. *State v. Allen,* 282 N.C. 503, 194 S.E. 2d 9 (1973) ; *State v. Ratliff,* 281 N.C. 397, 189 S.E. 2d 179 (1972) ; *State v. Hill,* 278 N.C. 365, 180

S.E. 2d 21 (1971) ; G.S. 15-27 (repealed effective July 1, 1975, by Chapter 1286, Section 26, 1973 Session Laws).

A warrantless search of a vehicle capable of movement may be made by officers when they have probable cause to search and if exigent circumstances make it impracticable to secure a search warrant. *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed. 2d 419 (1970) ; *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed. 2d 685 (1969) ; *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925) ; *State v. Allen, supra; State v. Ratliff, supra; State v. Jordan,* 277 N.C. 341, 177 S.E. 2d 289 (1970).

In the instant case there was sufficient evidence to constitute probable cause that the 1967 Chevrolet driven by defendant and taken to the police station had been involved in the kidnapping, rape, and murder of the deceased. Later in the day, this evidence was sufficient to cause a magistrate to issue a search warrant for the car. The officers who seized the automobile were faced with two dilemmas. First, if the automobile was not seized and impounded, the wife of the defendant would likely attempt to destroy or make unusable any evidence therein. This assumption was based on evidence that she had already disposed of the victim's class ring. The second was that unless the automobile was impounded and safeguarded any evidence in the car could be tainted and considered unreliable in the minds of the jury and perhaps even made inadmissible because of intervening uncontrolled access to the car by persons other than defendant. In *Chambers v. Maroney, supra,* at 51-52, 90 S.Ct. at 1981, 26 L.Ed. 2d at 428, Justice White, in upholding the search of a car, speaking for the United States Supreme Court, stated:

> "Arguably, because of the preference for a magistrate's judgment, only the immobilization of the car should be permitted until a search warrant is obtained; arguably, only the 'lesser' intrusion is permissible until the magistrate authorizes the 'greater'. But which is the 'greater' and which the 'lesser' intrusion is itself a debatable question and the answer may depend on a variety of circumstances. For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment."

We hold that the officers in this case had probable cause to seize and hold the car before presenting the probable cause issue to a magistrate and obtaining a valid search warrant. This assignment is overruled.

[4]  By his Assignment of Error No. 13, defendant asserts that the trial court erred when it allowed the introduction of staged photographs into evidence even though the testimony revealed that the photographs were staged with witnesses and with the automobiles of the alleged victim and of the defendant.

Defendant correctly concedes that a photograph of a person, place or object may be introduced into evidence to illustrate the testimony of a witness. *State v. Johnson,* 280 N.C. 281, 185 S.E. 2d 698 (1972) ; 1 Stansbury's N. C. Evidence, § 34, p. 93 (Brandis Rev. 1973). The photographs of the parking lot on which the alleged abduction took place were made on 22 August 1973, some eleven days after the incident allegedly occurred. They were made by witness Henry M. Dula, employer of the deceased, at the direction and under the supervision of the Lenoir Police Department. Photographs of this area included photographs of the parking lot, of the automobile driven by the deceased, of the alley leading to the parking lot, of the witness Cline in the alley, and in other places. The photographs also showed the defendant's car on the parking lot with the deceased's car. The defendant contends that one of the errors in posing the 1967 Chevrolet is that the photograph clearly shows its license number (BMW-522).

For a photograph to be used to illustrate the testimony of a witness it must be identified as portraying the scene with sufficient accuracy but need not have been made by the witness himself provided he can testify as to its adequacy as a representation. 1 Stansbury's, *supra,* § 34, pp. 93-95. Stansbury also points out that "[p]osed photographs of the reconstructed scene of an accident are admissible when properly identified by a witness as being accurate representations of the conditions as he saw them at the time in issue." 1 Stanbury's, *supra,* § 34, p. 97; *Hunt v. Wooten,* 238 N.C. 42, 76 S.E. 2d 326 (1953) ; *State v. Matthews,* 191 N.C. 378, 131 S.E. 743 (1926).

At the time the photographs were introduced into evidence and again in his charge, the trial court instructed the jury that the photographs were introduced "for the sole purpose of illustrating or explaining the testimony of the witnesses. These photo-

graphs . . . may not be considered by you for any other purpose." In addition, the photographs where staged were described to the jury as posed or staged photographs, designed to illustrate the testimony of the witnesses as to the type, style, color characteristics of the vehicles observed and their relative positions and the relative positions of the various witnesses in the parking lot. There could be no misunderstanding that the photographs were posed or staged.

Captain Triplett of the Lenoir Police Department testified as to the license number (BMW-522) of the 1967 Chevrolet which defendant had been driving prior to the alleged crimes and which had been legally impounded by the officers. The jury was informed that the photographs were made by a professional photographer after the alleged kidnapping and that they were offered for the limited purpose of illustrating the testimony of the witness. "Photographs are admissible in this State to illustrate the testimony of a witness, and their admission for that purpose under proper limiting instructions is not error." *State v. Crowder,* 285 N.C. 42, 203 S.E. 2d 38 (1974). *State v. Duncan,* 282 N.C. 412, 193 S.E. 2d 65 (1972) ; *State v. Cutshall,* 278 N.C. 334, 180 S.E. 2d 745 (1971). *See generally,* 1 Stansbury's, *supra,* § 34.

We hold that for the limited purpose of illustrating the testimony of witnesses, the posed or staged photographs were properly admitted into evidence. This assignment is overruled.

[5] By his Assignment of Error No. 12, defendant alleges that the trial court erred in allowing witnesses to make in-court identifications of the defendant when those identifications were tainted by the police having shown these witnesses police photographs of the defendant which impermissibly suggested to the witnesses that the defendant was in fact guilty of the crimes for which he was charged.

Defendant contends that each of the witnesses who identified the defendant in open court had previously been shown a group of police photographs or mug shots and that these photographs showed a frontal view, right profile and left profile of each of the persons photographed. Defendant particularly contends that the witness Cline had less than one minute to observe the side of the defendant's face, that he had never seen the defendant prior to 11 August 1973, and that his in-court identification was inadmissible.

State v. Woods

In *Simmons v. United States,* 390 U.S. 377, 384, 19 L.Ed. 2d 1247, 1253, 88 S.Ct. 967, 971 (1968), the court held that "each case must be considered on its own facts, and . . . convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside . . . only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. . . . . "

In each instance when the identification of defendant by a witness was questioned, the trial court held an extensive *voir dire* hearing. After two of these hearings, the court held that the testimony of the witness in question regarding the identification of defendant was not admissible. In the others, he held the identification testimony admissible. In each instance he found facts and made conclusions of law. Defendant strenuously objected to the identification of defendant and the deceased by the witness Cline. We quote some of the findings of fact made by the trial court and his conclusions of law as to this witness.

"FINDINGS OF FACT

\*          \*          \*

"That it was daylight. That there was nothing obscuring the vision of the witness, Cline, of either of these parties and that he observed the right and a portion of the front of the faces of the individuals whom he described.

\*          \*          \*

"That he was within twenty to thirty feet of the couple that he observed and never at any time attended a lineup in which the defendant was placed or observed the defendant in a lineup.

\*          \*          \*

"That the witness had ample opportunity to observe the side and a portion of the front of the faces of both parties present on the parking lot on the morning of August 11, 1973, and observed them from the time he emerged from the alley, crossed the street and turned to the jewelry store.

"That the identity [sic] by the witness, Cline, of the defendant and Paula Gail Hollar was based upon his observation of these two persons at the time he saw them in the parking lot near the jewelry store and the independent

recollection of what he saw on that occasion and not the photographs of the defendant which were displayed to him by the officers at the police station or upon the photograph of Paula Gail Hollar which he saw lying on the desk at the time or at some later time.

"That the witness's identification of the defendant and Paula Gail Hollar was of independent origin and did not originate in the police station of the town of Lenoir.

### "CONCLUSIONS OF LAW

"Based upon the foregoing Findings of Fact, the court concludes as a matter of law that the pre-trial identification procedure of displaying the photograph was not unnecessarily suggestive and conducive to irreparable mistaken identification and the court finds the evidence totally void of anything to suggest that the procedures as followed would manifestly offend fundamental standards of decency, fairness and justice and amount to denial of due process of law. Next, that there is no substantial likelihood of irreparable misidentification.

"Based upon the foregoing Findings of Fact and Conclusions of Law it is the order of the court that this witness be permitted, in open court, to identify this defendant."

In *State v. Tuggle*, 284 N.C. 515, 520, 201 S.E. 2d 884, 887 (1974), Chief Justice Bobbitt stated the rules governing *voir dire* hearings when identification testimony is challenged:

"When the admissibility of in-court identification testimony is challenged on the ground it is tainted by out-of-court identification(s) made under constitutionally impermissible circumstances, the trial judge must make findings as to the background facts to determine whether the proffered testimony meets the tests of admissibility. When the facts so found are supported by competent evidence, they are conclusive on appellate courts. *State v. McVay* and *State v. Simmons*, 277 N.C. 410, 417, 177 S.E. 2d 874, 878 (1970) ; *State v. McVay* and *State v. Simmons*, 279 N.C. 428, 432, 183 S.E. 2d 652, 655 (1971) ; *State v. Morris*, 279 N.C. 477, 481, 183 S.E. 2d 634, 637 (1971) ."

State v. Woods

*Accord, State v. Henderson,* 285 N.C. 1, 203 S.E. 2d 10 (1974) ;
*State v. Shore,* 285 N.C. 328, 204 S.E. 2d 682 (1974). *See,* 1
Stansbury's, *supra,* § 57, pp. 176-77.

In the present case the facts found by the trial court after
*voir dire* hearings concerning each witness allowed to identify
defendant were substantially as set out above for the witness
Cline, were supported by competent evidence and are conclusive
on this Court. This assignment is overruled.

**[6]** Defendant next assigns as error the admission of testimony
of a witness who was unable to identify with certainty an auto-
mobile or its occupants.

The witness Wilcox testified that she saw a light-green
Chevrolet with two passengers turn onto Old Mill Creek Road
at approximately 10:20 a.m. on Saturday, 11 August 1973. She
testified that she thought the car was a light-green 1967 Chevro-
let although she was uncertain of the color of the top. She
thought the driver was a male but was unsure about the passen-
ger. She noticed nothing unusual about the way the passengers
were seated.

Defendant contends that this testimony was highly prej-
udicial to defendant for it seeks to put the light-green car that
defendant had been driving near the location where the body of
deceased was found without any evidence as to who was driving
the car at the time.

Chief Justice Denny, in *State v. Hamilton,* 264 N.C. 277,
286-87, 141 S.E. 2d 506, 513 (1965), a case in which as here
the State relied on circumstantial evidence, stated: " . . . How-
ever, in criminal cases, every circumstance that is calculated to
throw any light upon the supposed crime is admissible. The
weight of such evidence is for the jury." *Accord, State v. Arnold,*
284 N.C. 41, 199 S.E. 2d 423 (1973) ; *State v. Shaw,* 284 N.C.
366, 200 S.E. 2d 585 (1973) ; *State v. Sneeden,* 274 N.C. 498,
164 S.E. 2d 190 (1968).

The testimony of the witness Wilcox was relevant in that
it placed a male driver in a light-green Chevrolet operating the
vehicle on the wrong side of the road on Hibriten Drive turning
onto the Old Mill Creek Road at approximately 10:20 a.m. on the
morning of 11 August 1973. This was near where the body of
deceased was found the next day.

This is a circumstance to be considered by the jury. The weight is for the jury. This assignment is overruled.

[7]   Defendant next assigns as error the failure of the trial court to charge on defendant's evidence relating to alibi.

Defendant's sister, Barbara Minton, testified that defendant was at her house on 11 August 1973 from 7:00 a.m. to 7:40 a.m. and later that same morning stayed from 10:00 a.m. until 10:15 a.m.

Louise Wilcox testified for the State that she saw two people drive onto Old Mill Creek Road at about 10:20 a.m. that same morning.

This is the only evidence cited by defendant of an alibi.

Although it is doubtful if this evidence is sufficient to require the court to charge on alibi even if requested to do so, no such request was made in this case.

In *State v. Hunt,* 283 N.C. 617, 197 S.E. 2d 513 (1973), we established the rule in this jurisdiction that the court is not required to give an instruction on alibi unless requested to do so by the defendant.

In *State v. Shore,* 285 N.C. 328, 341, 204 S.E. 2d 682, 690 (1974), Justice Huskins, speaking for the Court, said:

> "Prior to decision of this Court in *State v. Hunt,* 283 N.C. 617, 197 S.E. 2d 513 (filed 12 July 1973), a defendant who offered alibi evidence was entitled to such instruction without specifically requesting it. *State v. Vance,* 277 N.C. 345, 177 S.E. 2d 389 (1970); *State v. Leach,* 263 N.C. 242, 139 S.E. 2d 257 (1964); *State v. Gammons,* 258 N.C. 522, 128 S.E. 2d 860 (1963); *State v. Spencer,* 256 N.C. 487, 124 S.E. 2d 175 (1962).

> "In *State v. Hunt, supra,* we held 'that reason and authority support a different rule, namely, that the court *is not required* to give such an instruction unless it is requested by the defendant. Hence, the cited decisions, in respect of the rule stated above, are overruled. The rule stated herein will be applicable in trials commenced after the filing of this opinion. . . . ' The opinion in *Hunt* was filed 12 July 1973. . . . "

The trial of the present case began on 21 January 1974. In the absence of a request for instruction on the evidence of an alibi, no such instruction was required. This assignment is overruled.

[8] By his Assignment of Error No. 20, defendant contends the trial court erred in failing to submit to the jury the question of defendant's guilt of second degree murder as a lesser included offense under the first degree murder indictment.

On 11 August 1973, G.S. 14-17 in part provided:

"A murder which shall be perpetrated by means of poison, lying in wait, imprisonment, starving, torture, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary or other felony, shall be deemed to be murder in the first degree and shall be punished with death. . . . ."

The trial judge, after defining "kidnapping" and "rape," charged the jury:

"So, I instruct you, members of the jury, that if you find from the evidence and beyond a reasonable doubt that on or about the 11th day of August, 1973, Vernon Junior Woods struck Paula Gail Hollar on the head with a blunt instrument . . . while committing, or attempting to commit the crime of kidnapping or rape, and that these blows . . . proximately caused Paula Gail Hollar's death, it would be your duty to return a verdict of Guilty of Murder in the First Degree. However, if you do not so find, or have a reasonable doubt as to one or more of these things it would be your duty to return a verdict of Not Guilty."

The judge did not instruct regarding proof of murder in the first degree by killing with premeditation and deliberation or regarding second degree murder.

When all the evidence tends to show that the accused killed the deceased in the perpetration or attempted perpetration of a felony and there is no evidence of guilt of a lesser offense, the court correctly refrains from submitting the question of defendant's guilt of murder in the second degree. *State v. Hairston* and *State v. Howard* and *State v. McIntyre,* 280 N.C. 220, 185 S.E. 2d 633 (1972); *State v. Doss,* 279 N.C. 413, 183 S.E.

2d 671 (1971) ; *State v. Crawford,* 260 N.C. 548, 133 S.E. 2d 232 (1963) ; *State v. Scales,* 242 N.C. 400, 87 S.E. 2d 916 (1955) ; *State v. Mays,* 225 N.C. 486, 35 S.E. 2d 494 (1945). In the present case, the State's evidence (consisting of over 300 pages in the record) tended to show that Paula Gail Hollar was kidnapped by defendant on the streets of Lenoir, forced into his automobile, driven to a secluded area off Hibriten Drive, raped, and murdered. Defendant's evidence sought to show that Mrs. Hollar had not been raped, that she had not been kidnapped, and that in any event defendant was not the perpetrator of the crimes. The jury was instructed that if they believed deceased was killed but did not believe that this occurred during the perpetration of rape or kidnapping by defendant, they were to return a verdict of "not guilty." We find no evidenec in the 516-page record of this case that suggests deceased was killed other than in the perpetration or attempted perpetration of the felonies of kidnapping and rape. We hold therefore that the trial judge did not err in failing to instruct the jury on the question of defendant's guilt of the lesser included offense of second degree murder.

By Assignments of Error Nos. 18 and 19, defendant contends the trial court erred in overruling his motions for directed verdicts of not guilty and motion to set aside the verdicts.

The motion for a directed verdict of not guilty challenges the sufficiency of the evidence to go to the jury. *State v. Wiley,* 242 N.C. 114, 86 S.E. 2d 913 (1955) ; *State v. Brackville,* 106 N.C. 701, 11 S.E. 284 (1890). "When the evidence is sufficient to overrule defendant's motions for nonsuit, the evidence is also sufficient to overrule defendant's motion for a directed verdict of not guilty, since the motions have the same legal effect." 2 Strong, N. C. Index 2d, Criminal Law § 109 (1974 Supp.) ; *State v. Glover,* 270 N.C. 319, 154 S.E. 2d 305 (1967). On motion to nonsuit, the evidence must be considered in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn therefrom. *See,* 2 Strong, N. C. Index 2d, Criminal Law § 104 (1967), and numerous cases therein cited. Contradictions and discrepancies are for the jury to resolve, and do not warrant nonsuit. *Id.* Only the evidence favorable to the State will be considered, and defendant's evidence relating to matters of defense will not be considered. *Id.*

[9] The State's case is based upon circumstantial evidence. The State offered numerous witnesses whose testimony tended

to show that the defendant was in downtown Lenoir around 9:00 a.m. on 11 August 1973 driving a 1967 light-green Chevrolet with a dark top. Several women testified that they were approached by defendant on this morning. There was testimony that a man and woman were seen scuffling in the parking lot where deceased's car was parked and that deceased was shoved into defendant's car. A car like defendant's carrying two occupants and with a male driver was seen about an hour and twenty minutes later on the wrong side of Hibriten Drive and the car turned into Old Mill Creek Road. The victim's body was found in a stream nearby late the next day. The victim had live spermatozoa in her vagina, her vagina and rectal area had been injured and there was a tear in the peritoneum. Rings identified as belonging to the victim were given by the defendant to his wife on the afternoon of 11 August. A torn portion of an insurance identification card was found in the 1967 Chevrolet operated by defendant, and this torn portion matched the other portion of the card found with the personal effects of the deceased. Fibers found in the 1967 Chevrolet matched fibers from the dress worn by the deceased on August 11.

The State's evidence in this case was clearly adequate to survive defendant's motion for directed verdict and the case was properly submitted to the jury. This assignment is overruled.

[10] Defendant next contends that the trial court erred in overruling his motion to arrest the judgments entered in the kidnapping and rape cases. We agree.

The trial judge instructed the jury that in order to find defendant guilty, they must find that defendant caused the death of deceased while committing or attempting to commit the crimes of rape or kidnapping. It is clear from this instruction that proof of rape or kidnapping was an indispensable element in the State's proof of murder in the first degree. This being true, neither rape nor kidnapping affords basis for additional punishment under the merger rule, most recently discussed in *State v. McLaughlin,* 286 N.C. 597, 213 S.E. 2d 238 (1975). *See also, State v. Moore,* 284 N.C. 485, 202 S.E. 2d 169 (1974); *State v. Carroll,* 282 N.C. 326, 193 S.E. 2d 85 (1972); *State v. Peele,* 281 N.C. 253, 188 S.E. 2d 326 (1972); *State v. Thompson,* 280 N.C. 202, 185 S.E. 2d 666 (1972). This assignment is sustained and the judgments in the kidnapping and rape cases are arrested.

By Assignment of Error No. 9, defendant contends it was prejudicial error to allow Laura Ward, an expert in forensic serology employed by the State Bureau of Investigation Chemical Laboratory, to testify as to the presence of human blood on the seat cover of the 1967 Chevrolet automobile allegedly driven by defendant on 11 August 1973.

At trial, Laura Ward testified that her examination of the seat cover revealed a bloodstain approximately two inches in diameter. The quantity was sufficient to allow her to determine the blood to be of human origin, but insufficient to allow her to determine the blood type. She further testified that the blood was diluted by some substance, but could not determine what that substance was. She could not tell how long the blood had been on the seat cover—whether one or two weeks. Defendant moved to strike this testimony as being of no probative value, which motion was denied by the trial court.

In 1 Stansbury's, *supra,* § 78, we find:

> "The standard of admissibility based on relevancy and materiality is of necessity so elastic, and the variety of possible fact situations so nearly infinite, that an exact rule cannot be formulated. In attempting to express the standard more precisely, the Court has emphasized the necessity of a *reasonable,* or *open and visible* connection, rather than one which is remote, latent, or conjectural, between the evidence presented and the fact to be proved by it . . . . "

And this Court has said that " . . . in criminal cases, every circumstance that is calculated to throw any light upon the supposed crime is admissible." *State v. Hamilton, supra. Accord, State v. Arnold, supra; State v. Shaw, supra.*

Prior to the testimony of Laura Ward, the State offered evidence tending to show that deceased had been forced into an automobile like that driven by defendant on 11 August, and that the deceased suffered abrasions and traumas to various parts of her anatomy before her death. The State also introduced evidence tending to show that a portion of deceased's insurance identification card was found in the 1967 Chevrolet belonging to defendant. Subsequent to the testimony of Laura Ward, the State offered evidence tending to show that fibers from the seat cover of the 1967 Chevrolet matched fibers from the clothing worn by deceased on the day of her death.

To be admissible, an item of evidence need only have a logical tendency to prove a fact in issue, and need not *prove* a material fact *of itself*. As is said in McCormick on Evidence 436 (2d ed. 1972) :

" . . . Items are normally offered and admitted or rejected as units, though of course the judge will consider any proof already made by the proponent as indicating the bearing of the item offered, and may in his discretion ask the proponent what additional circumstances he expects to prove. But when it is offered and judged singly and in isolation, as it frequently is, it cannot be expected by itself to furnish conclusive proof of the ultimate fact to be inferred. . . . This is the distinction between relevancy and sufficiency. The test of relevancy, which is to be applied by the trial judge in determining whether a *particular item or group of items of evidence* is to be admitted is a different and less stringent one than the standard used at a later stage in deciding whether *all the evidence* of the party on an issue is sufficient to permit the issue to go to the jury. A brick is not a wall." (Emphasis added.)

*See also,* 1 Stansbury's, *supra,* § 78, p. 238.

[11]  When considered with other circumstances shown by the evidence, we think the fact that there was a human bloodstain on the seat cover of the automobile alleged to have been utilized in the kidnapping of deceased and driven by defendant on the morning of 11 August 1973 is highly probative of a material fact in this case and was properly admitted in evidence. The fact that the State could not show the blood type went to the weight of the evidence and not to its admissibility. This assignment is overruled.

[12]  Defendant next contends that the court erred when it allowed witness W. E. Pearce to testify regarding matters within his common experience and not based on expert tests conducted by him.

Mr. Pearce, a forensic chemist for the State Bureau of Investigation Chemical Laboratory, testified at length concerning his examination of fibers from the victim's dress, his examination of fibers seized in the search of the 1967 Chevrolet, and his expert opinion as to similarity of the fibers. Mr. Pearce used microscopic examination, solvent tests and thin-layer chroma-

tography in reaching the conclusion that the fibers found in the automobile could have come from the victim's dress. He testified that it was "unlikely" that these fibers came from a different article dyed in the same manner as the dress.

On cross-examination, Pearce testified that he had some distinct impressions as to how common the various fibers were. He said the cotton fiber was fairly common but that the red polyester fiber was "quite unique unto itself" and "reasonably rare" due to the fact that it was dyed by a mixture of several different dyes rather than by one of the approximately thirty dyes most commonly used. He stated that it was therefore "unlikely" that these fibers came from a source other than the victim's dress. He concluded that he did not know exactly what quantity polyester fiber was colored with the same mixture of dyes or how much of this fiber was distributed in the Lenoir area, and that he therefore could not determine to exact probability whether the fibers found in the automobile were from a source other than the victim's dress, but that it was "unlikely" since he knew that " . . . just going through life . . .you don't routinely see two women with the same dress on. It does happen, but it is not extremely common. You . . . go to a clothing store and . . . see duplications, but they are not the rule."

It is the rule in North Carolina that "[a] finding by the trial judge that the witness possesses the requisite skill will not be reversed on appeal unless there is no evidence to support it or the judge abuses his discretion." 1 Stansbury's, *supra*, § 133. *State v. Johnson,* 280 N.C. 281, 185 S.E. 2d 698 (1972) ; *State v. Vestal,* 278 N.C. 561, 180 S.E. 2d 755 (1971) ; *Hunt v. Wooten,* 238 N.C. 42, 76 S.E. 2d 326 (1953). In this case, the trial judge found Mr. Pearce to be an expert and there is ample evidence to support this finding. It is clear that the witness's statements to the effect that the red polyester fibers were "reasonably rare" and that it was "unlikely" that the fibers came from a source other than the dress of the victim were based on his expertise. He evidenced a professional familiarity with dyes and dyeing techniques, and knew which dyes were more common than others. We think the further statement by the witness on cross-examination that it was also unlikely that two women might own the same dress was inconsequential in this setting. Clothing merchandising was not this expert's area of expertise, as the witness pointed out when he said his answer was based on "just going through life." Defendant, having asked the

questions, cannot now be heard to say the court erred in allow-
ing seemingly innocuous answers. This assignment is overruled.

[13]  Defendant next assigns as error the trial court's denial
of his motions to quash the bills of indictment for the reason
that the felony-murder doctrine under which the State elected
to proceed is unconstitutionally vague in that kidnapping was
not listed in G.S. 14-17 at the time of the offense as one of the
felonies that would support a conviction under the felony-murder
rule.

Suffice to say that, prior to the amending of G.S. 14-17 to
add kidnapping to the list of specified felonies (1973 Session
Laws, Chapter 1201, Section 1, effective 8 April 1974), it was
well established that any felony inherently dangerous to life is
within the purview of G.S. 14-17 though not specified therein.
*State v. Thompson,* 280 N.C. 202, 185 S.E. 2d 666 (1972); *State
v. Rich,* 277 N.C. 333, 177 S.E. 2d 422 (1970); *State v. Streeton,*
231 N.C. 301, 56 S.E. 2d 649 (1949). We held in *State v. Stree-
ton, supra,* that a homicide in the perpetration of kidnapping is
first degree murder, Justice Ervin stating that "[w]hen a per-
son undertakes by force or violence to kidnap another . . . .
contrary to G.S. 14-39, he commits or attempts to commit a fel-
ony which has a natural tendency to cause death."

Rape was listed in G.S. 14-17 at the time of the alleged
murder as one of the felonies that would support a conviction
under the felony-murder rule. Either kidnapping or rape would
support a conviction under this rule. There is no merit to this
assignment.

[14]  Defendant finally contends that his rights under the
Eighth and Fourteenth Amendments to the United States Con-
stitution were violated in this case by the imposition of the
mandatory death sentence. Defendant contends specifically that
due to the large amount of discretion present in the administra-
tion of criminal justice, particularly the discretion vested in the
district attorney in determining which cases will be prosecuted
for the capital crime, or which should be prosecuted for a lesser
offense, the imposition of the death penalty is cruel and unusual
punishment and operated to deprive him of his rights of equal
protection of the law. Defendant's contentions were extensively
argued, carefully considered and rejected in *State v. Jarrette,*
284 N.C. 625, 202 S.E. 2d 721 (1974). We adhere to our deci-

sion in that case. *See also, State v. Fowler,* 285 N.C. 90, 203 S.E. 2d 803 (1974) ; *State v. Dillard,* 285 N.C. 72, 203 S.E. 2d 6 (1974) ; *State v. Crowder,* 285 N.C. 42, 203 S.E. 2d 38 (1974) ; *State v. Waddell,* 282 N.C. 431, 194 S.E. 2d 19 (1973).

Because of the imposition of the death sentence, we have carefully examined the entire record in this case and each assignment of error brought forward by defendant. Our examination discloses that defendant received a fair trial free from prejudicial error.

As to the murder charges: No error.

As to the kidnapping and rape charges: Judgments arrested.

Chief Justice SHARP dissents as to the death sentence and votes to remand for the imposition of life imprisonment for the reasons stated in her dissenting opinion in *State v. McLaughlin,* 286 N.C. 597, 213 S.E. 2d 238 (1975).

Justice COPELAND dissents as to death sentence and votes to remand for imposition of a sentence of life imprisonment for the reasons stated in his dissenting opinion in *State v. Williams,* 286 N.C. 422 at 437, 212 S.E. 2d 113 at 122 (1975).

Justice EXUM dissents from that portion of the majority opinion which affirms the death sentence and votes to remand this case in order that a sentence of life imprisonment can be imposed for the reasons stated in his dissenting opinion in *State v. Williams,* 286 N.C. 422, 212 S.E. 2d 113 (1975), other than those relating to the effect of Section 3 of Chapter 1201 of the 1973 Session Laws.