IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-422

No. COA20-648

Filed 17 August 2021

Currituck County, No. 19-CVS-239

85' AND SUNNY, LLC, Petitioner,

v.

CURRITUCK COUNTY, Respondent.

Appeal by Respondent and cross-appeal by Petitioner from order entered 2 March 2020 by Judge L. Lamont Wiggins in Currituck County Superior Court. Heard in the Court of Appeals 8 June 2021.

*Williams Mullen, by Thomas H. Johnson, Jr., and Lauren E. Fussell, for Petitioner-Appellee/Cross-Appellant.*

*Currituck County Attorney Donald I. McRee, Jr., for Respondent-Appellant/Cross-Appellee.*

COLLINS, Judge.

¶ 1        This case arises from improvements 85 Degrees and Sunny, LLC ("Petitioner"), seeks to make to a campground located in Currituck County, North Carolina. Both Currituck County ("Respondent") and Petitioner appeal from the superior court's order reversing the Currituck County Board of Adjustment's ("Board") (1) determination of the number of campsites that existed on Petitioner's campground as of 1 January 2013, and (2) conclusion that Currituck County's Unified

Development Ordinance ("UDO") permitted some, but not all, of Petitioner's proposed improvements to the campground. We affirm in part and reverse in part the superior court's order and remand to the superior court to essentially affirm the Board's entire order.

## I.  Procedural History and Factual Background

The Hampton Lodge Campground ("Campground") has existed since at least May 1967. At the time the Campground began operation, the County did not regulate the use of property by zoning regulations. Under the County's initial 1971 zoning ordinance, campgrounds were a permitted use of property in certain districts, subject to certain requirements. There was no documentation that the Campground's owners had complied with the 1971 ordinance's requirements for approved campgrounds and the Campground operated as a nonconforming use. The Campground has continued as a nonconforming use under subsequent County zoning regulations adopted in 1975, 1982, 1989, 1992, 2007, and 2013.

Under the current UDO, adopted in 2013, the Campground continues to be a nonconforming use. The UDO provides that "[a] nonconforming use shall not be changed to any other nonconforming use[,]" UDO § 8.2.2., and generally "shall not be enlarged, expanded in area, or intensified[,]" UDO § 8.2.3.A. Additionally, section 8.2.6. of the UDO deems all existing private campgrounds as nonconforming uses, subject to certain standards, including in relevant part:

### A. General Standards

**(1)** Camping is an allowed use of land only in existing campgrounds and campground subdivisions.

. . . .

**(5)** Modifications to existing campgrounds are permitted provided the changes do not increase the nonconformity with respect to [the] number of campsites that existed on January 1, 2013.

### B. Existing Campgrounds

**(1)** Existing campgrounds may not be expanded to cover additional land area or exceed the total number of campsites that existed on January 1, 2013.

UDO § 8.2.6.

¶ 4  Throughout the Campground's history, owners and developers have submitted documentation to county entities reflecting varying numbers of campsites in existence. A camper subdivision plat showing over 700 campsites was submitted in 1973, but never approved. A site plan submitted alongside an application for a conditional use permit for a concert in 1996 showed 234 campsites at the property, 90 vehicular parking spaces, and a tent camping area. A site plan submitted with a similar application in 1997 again showed 234 campsites and a tent camping area. Neither plan indicated the specific number of tent campsites within the tent camping area.

¶ 5 Petitioner purchased the Campground in June 2018 and submitted a Major Site Plan ("Plan") to Currituck County for review. The Plan showed 314 campsites for recreational vehicle, trailer, or camper use, and 78 campsites for tent camping. The Plan also proposed the following improvements:

- two new restroom and bathhouse facilities,
- a swimming pool and pool house,
- improvements to the on-site septic system,
- two dog park areas,
- playground improvements, and
- the demolition and replacement of an existing residence and barn for the caretaker/manager of the campground.

¶ 6 In its review of the Plan, the County determined that the number of campsites exceeded the number of campsites that existed on 1 January 2013, and the additional amenities shown on the Plan were not permitted under the UDO.[1]

¶ 7 In August 2018, Petitioner filed an Application for Interpretation and supporting materials with the Currituck County Planning and Development Director ("Director"). Petitioner sought a determination of (1) the number of campsites existing on the Campground on 1 January 2013 and (2) whether the UDO allowed Petitioner's proposed improvements to the property.

¶ 8 The Director issued a Letter of Determination ("Letter") on 1 January 2013 wherein the Director determined "that 234 campsites have received some form of

---

[1] A copy of the County's determination is not in the Record on Appeal but is referenced in Plaintiff's Petition for Writ of Certiorari to the superior court.

approval between 1971 and 1997 and 234 campsites existed on January 1, 2013." The Director also determined that the number of "[t]ent campsites would need to be calculated based on the historical tent area divided by the minimum campsite size (3000 square feet) required by all zoning regulations before the 2013 UDO." The Director could "[]not verify, and therefore [did] not conclude, that 78 tent campsites were established prior to January 1, 2013."

¶ 9          Regarding Petitioner's proposed improvements, the Director interpreted the term "modification" in section 8.2.6.A.(5) to require that "something needs to exist before a change, alteration, or amendment can be made[,]" and concluded as follows: "only changes to existing buildings and structures are permitted"; existing facilities— "restroom facilities, piers, docks, bulkheads, camp store, and other recreation facilities"—could be modified; "[t]he new facilities listed in the application . . . such as the new bathroom facilities, swimming pool, pool house and the like" "are not limited changes but are substantial and an impermissible expansion, enlargement and intensification of a nonconforming use" prohibited under section 8.2.3.A.

¶ 10          Petitioner appealed to the Board. At the hearing before the Board, the Director testified to the history of permits applied for and issued to the Campground, including the 1996 and 1997 conditional use permits. Petitioner tendered Warren Eadus, who was accepted as an expert witness in site plans. Eadus testified that there were 408 RV sites and 50 tent sites at the Campground. Paul O'Neal, who resided three miles

south of the Campground for 50 years, testified that he was hired to perform maintenance on the campsites in 1980. O'Neal testified that in 1980, there were 175 to 200 campsites, and the Campground had not changed from that time. John Pappas, a previous owner of the Campground, testified that there were 252 utility hookups, that a previous music festival was held with close to 400 camping units in attendance, and stargazers had camped for 25 years in the wooded portion of the property.

¶ 11        Other previous owners averred that "[c]ampers have been free to utilize the entire premises for their campsite" and "[t]here has never been a limitation imposed on the number of the sites, the location of the sites, nor occupancy by vehicles of any kind, or tents, or simply sleeping bags and campfire sites." Ann Slade, a co-manager of the Campground since 1998, averred that the entire Campground was used "as needed for tents, trailers and recreational vehicles." Slade averred that in addition to the campsites with utility connections, campers would use campsites in both the forested and open field areas of the property. According to Slade, during music festivals in 1995 through 1997, approximately 400 campsites were used at the Campground. Similarly, James Baeurle, Petitioner's current operator, testified to the Board that on many occasions, 400 to 500 people camped at the campground for one event.

¶ 12        After the hearing, the Board issued an order wherein it found, in part:

27. On January 1, 2013, there were 234 existing campsites and a designated area which was used for tent camping at Hampton Lodge.

28. The number of campsites within the tent camping area should be calculated based on the designated area for tent camping on a scaled version of the 96/97 site plan, divided by the minimum campsite size (3000 square feet) required by all zoning regulations prior to the 2013 UDO.

. . . .

36. Modifications to existing buildings and structures are permitted inasmuch as the changes do not extend to additional structures or to land outside the original structure.

37. Sunny's proposal and site plan includes the addition of new facilities to Hampton Lodge, i.e. new bathroom facilities, swimming pool, pool house, piers etc.

¶ 13 Upon its findings, the Board concluded, in relevant part:

3. Pursuant to 2013 UDO §§ 2.4.16(D)(3) and 10.1, 2013 UDO §8.2.6.A.(5) must be read in pari materia with the 2013 UDO, specifically 2013 UDO §8.

4. Modifications to existing buildings and structures are permitted inasmuch as the changes do not extend to additional structures or to land outside the original structure.

5. The new facilities proposed by Sunny qualify as an impermissible expansion, enlargement and intensification of a nonconforming use and are not permitted.

Based upon its findings of fact and conclusions of law, the Board affirmed the

Director's Letter.

¶ 14     Petitioner petitioned the superior court for a writ of certiorari to review the Board's decision. After reviewing the record on appeal, the Plan, the UDO, and the memoranda of the Parties, and hearing oral arguments on 27 January 2020, the superior court granted certiorari and reversed the Board. By written order, the superior court found in relevant part:

> 12. The . . . requested number of RV and tent campsites proposed in Petitioner's Major Site Plan are consistent with the number of campsites in existence on Hampton Lodge on January 1, 2013. Therefore, the Court hereby allows 314 RV sites and 78 tent sites on the Property and finds the number of proposed campsites does not exceed the number of campsites in existence on the property as of January 1, 2013, and does not increase or expand the intensity of the nonconforming use, as set forth in Section 8.2.6 of the UDO. Notably, the property has potential, excluding wetland acreage, to be developed differently, and more intensely, than as proposed by Petitioner on the Major Site Plan.
>
> 13. . . . [A]ll health and safety improvements to Hampton Lodge that are included on the Major Site Plan, specifically including, infrastructure improvements to update access roads and water and septic systems on the property, do not violate the provisions of the UDO governing nonconforming uses. The new bathhouses and expansions of existing bathhouses proposed in the Major Site Plan are permitted improvements to the Property pursuant to the provisions of the UDO. The Court finds the proposed health and safety improvements to Hampton Lodge do not increase or intensify the nonconforming use and are in keeping with the public policy of the State of North Carolina to allow improvements to nonconforming uses to enhance health and safety.
>
> 14. The Major Site Plan also proposes adding a porch

to the existing footprint of the Camp Store located on the property. While the proposed porch addition is not within the footprint of the Camp Store in existence on January 1, 2013, the proposed addition is an appendage that will not increase the intensity or scope of the nonconforming use. Therefore, the proposed porch on the Camp Store is allowed.

15. The Major Site Plan proposes installing a pool on Hampton Lodge. The pool is not permitted within the provisions of the UDO and is not allowed.

¶ 15    The superior court concluded, in relevant part:

16. The . . . Board of Adjustment's decision was arbitrary and capricious [and] not supported by substantial, competent and material evidence in view of the entire record as set forth above.

17. The . . . Board of Adjustment committed an error of law in concluding that the new facilities proposed by Petitioner qualify as impermissible expansion, enlargement and intensification of a nonconforming use and are not permitted under the UDO, with the exception of the swimming pool.

The superior court thus

remanded with instructions for the Board of Adjustment to reverse the [Letter] and find that at least 314 campsites for RV, trailer, or camper use and 78 sites for ordinary tent camping as shown on the Major Site Plan existed as of January 1, 2013, and that the modifications shown on the Major Site Plan, except for the pool, are in compliance with the provisions of the UDO, should be allowed, and do not increase or expand the intensity of the nonconforming use.

¶ 16    Respondent appealed and Petitioner cross-appealed.

## II. Discussion

On appeal, Respondent contends that the superior court erred by (1) failing to articulate the standard of review applied to each issue; (2) reversing the Board's decision as to the number of campsites existing at the Campground on 1 January 2013; and (3) reversing the Board's decision that certain modifications proposed in Petitioner's Plan were not permitted under the UDO. Petitioner contends that the superior court erred by affirming the Board's determination that the swimming pool was not allowed under the UDO.

### A. Standard of Review

A different standard of review applies at each level of an appeal from a decision of an administrative official charged with enforcing a zoning or unified development ordinance. A "board of adjustment shall hear and decide appeals from decisions of administrative officials charged with enforcement of the zoning or unified development ordinance . . . ."[2] N.C. Gen. Stat. § 160A-388(b1) (2019); N.C. Gen. Stat. § 153A-345.1 (2019) ("The provisions of [N.C. Gen. Stat. §] 160A-388 are applicable to counties.").[3] In such an appeal, "the board of adjustment may reverse or affirm,

---

[2] The Director is the County's administrative official charged with enforcing the UDO, *see* UDO § 9.5.1., and is empowered to decide applications for interpretation of the UDO, *see* UDO § 2.4.16.

[3] Effective 19 June 2020, the General Assembly consolidated the provisions governing planning and development regulations by local governments into a new Chapter 160D of the General Statutes. *See* An Act to Clarify, Consolidate, and Reorganize the Land-Use Regulatory Laws of the State, S.L. 2019-111 § 2; An Act to Complete the Consolidation of Land-Use Provisions Into one

wholly or partly, or may modify the decision appealed from and shall make any order, requirement, decision, or determination that ought to be made." N.C. Gen. Stat. § 160A-388(b1)(8). Additionally, "[t]he board shall have all the powers of the official who made the decision." *Id.*

¶ 19    A party may seek superior court review of a board of adjustment's decision by filing a petition for review in the nature of certiorari. N.C. Gen. Stat. § 160A-388(e2)(2) (2019).

> (1) When reviewing the decision of a decision-making board under the provisions of this section, the court shall ensure that the rights of petitioners have not been prejudiced because the decision-making body's findings, inferences, conclusions, or decisions were:
>
> > a. In violation of constitutional provisions, including those protecting procedural due process rights.
> >
> > b. In excess of the statutory authority conferred upon the city or the authority conferred upon the decision-making board by ordinance.
> >
> > c. Inconsistent with applicable procedures specified by statute or ordinance.
> >
> > d. Affected by other error of law.
> >
> > e. Unsupported by substantial competent evidence in view of the entire record.
> >
> > f. Arbitrary or capricious.

---

Chapter of the General Statutes as Directed by S.L. 2019-111, as Recommended by the General Statutes Commission, S.L. 2020-25 § 51(b).

N.C. Gen. Stat. § 160A-393(k) (2019).

¶ 20        "Generally, the petitioner's asserted errors dictate the scope of judicial review." *NCJS, LLC v. City of Charlotte*, 255 N.C. App. 72, 76, 803 S.E.2d 684, 688 (2017). "[I]f the petitioner contends the [b]oard's decision was not supported by the evidence or was arbitrary and capricious, then the reviewing court must apply the whole record test." *Id.* (quotation marks and citations omitted). In applying the whole record test, the "reviewing superior court sits in the posture of an appellate court and does not review the sufficiency of evidence presented to it but reviews that evidence presented" to the board. *Mann Media, Inc. v. Randolph Cnty. Plan. Bd.*, 356 N.C. 1, 12, 565 S.E.2d 9, 17 (2002) (quotation marks and citation omitted). The whole record test requires the superior court to "examine all competent evidence (the 'whole record') in order to determine whether the [board's] decision is supported by substantial evidence." *Id.* at 14, 565 S.E.2d at 17. "Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion[.]" *Sun Suites Holdings, L.L.C. v. Bd. of Aldermen of Garner*, 139 N.C. App. 269, 273, 533 S.E.2d 525, 528 (2000). "The 'whole record' test does not allow the reviewing court to replace the board's judgment as between two reasonably conflicting views, even though the court could justifiably have reached a different result had the matter been before it *de novo*." *Mann Media,* 356 N.C. at 14, 565 S.E.2d at 17-18 (citation omitted).

¶ 21        Where a party contends the board's decision was based on an error of law, *de*

*novo* review is proper. *Id.* at 13, 565 S.E.2d at 17. Under *de novo* review, the superior court "consider[s] the matter anew[] and freely substitutes its own judgment for the agency's judgment." *Sutton v. N.C. Dep't of Labor*, 132 N.C. App. 387, 389, 511 S.E.2d 340, 341 (1999).

¶ 22 A superior court may apply both the whole record test and *de novo* review in a single case, "but the standards are to be applied separately to discrete issues." *Sun Suites*, 139 N.C. App. at 273-74, 533 S.E.2d at 528 (citations omitted). This Court reviews a superior court's order reviewing a board's decision to determine "whether the superior court applied the correct standard of review" and "whether the superior court correctly applied that standard." *Myers Park Homeowners Ass'n, Inc. v. City of Charlotte*, 229 N.C. App. 204, 208, 747 S.E.2d 338, 342 (2013) (quotation marks, brackets, and citation omitted).

**B. Superior Court's Articulated Standards of Review**

¶ 23 At the outset, Respondent argues that the superior court's order must be vacated for failure to articulate the standard of review it applied to each issue. We disagree.

¶ 24 When reviewing an order by a county board of adjustment, a superior court "must set forth sufficient information in its order to reveal the scope of review utilized and the application of that review." *Mann Media*, 356 N.C. at 13, 565 S.E.2d at 17 (quotation marks and citations omitted). In this case, Petitioner alleged before the

superior court that: the Board's decision to affirm the Letter was arbitrary and capricious; the Board's conclusion that only 234 campsites existed as of 1 January 2013 was arbitrary and capricious and was not supported by substantial, competent, and material evidence; the Board committed an error of law in concluding that Petitioner was permitted to modify existing facilities but not construct new facilities; and the Board's decision to affirm the Letter was an abuse of discretion.

¶ 25        The superior court's order specifically recites these allegations. The superior court's findings, along with its conclusion that "the Board of Adjustment's decision was arbitrary and capricious [and] not supported by substantial, competent and material evidence in view of the entire record as set forth above[,]" was sufficient information to reveal that the superior court applied the whole record test to Petitioner's arguments that the Board's decision to affirm the Letter was arbitrary and capricious and the Board's conclusion that only 234 campsites existed as of 1 January 2013 was arbitrary and capricious and was not supported by substantial, competent, and material evidence. Additionally, the superior court's order specifically articulated the *de novo* standard for Petitioner's argument that the Board committed an error of law in applying the UDO to the proposed improvements. It is evident that the superior court articulated the correct standard of review it applied to each issue.

## C. Determination of the Number of Campsites

¶ 26    Respondent argues that the superior court failed to correctly apply the whole record test in its review of the Board's conclusion that, as of 1 January 2013, 234 improved campsites and a number of tent campsites—determined by dividing the delineated tent camping area by 3,000 square feet—existed at the Campground. Respondent contends that there was substantial evidence in the record to support the Board's conclusion.

¶ 27    The Board found, in relevant part, as follows:

> 19. In 1996 and 1997, Hampton Lodge applied for two special event permits at which time they submitted a site plan of the campground. The site plan shows 234 campsites, 90 vehicular parking spaces and an area for tent camping. The same site plan was submitted in 1996 and 1997.
>
> 20. The 96/97 site plan was used at Hampton Lodge to direct customers to campsite locations until the campground was sold to Sunny in 2018.
>
> . . . .
>
> 25. The 96/97 site plan is the most competent evidence regarding the number of campsites that existed at Hampton Lodge on January 1, 2013.
>
> 26. The site plans submitted by Sunny demonstrate 392-700 "potential" campsites for Hampton Lodge, not existing campsites on January 1, 2013, as required by UDO 8.2.6.A.(5).
>
> 27. On January 1, 2013, there were 234 existing campsites and a designated area which was used for tent camping at Hampton Lodge.
>
> 28. The number of campsites within the tent camping area should be calculated based on the designated

area for tent camping on a scaled version of the 96/97 site plan, divided by the minimum campsite size (3000 square feet) required by all zoning regulations prior to the 2013 UDO.

¶ 28 The Board's findings were supported by the 1996 and 1997 site plans. These site plans, submitted to county entities by previous owners of the campgrounds, each showed 234 campsites and a tent camping area. The Board found that these site plans were used until 2018 "to direct customers to campsite locations," a finding that is not specifically challenged by Petitioner and is therefore binding on appeal. *See Church v. Bemis Mfg. Co.*, 228 N.C. App. 23, 26, 743 S.E.2d 680, 682 (2013) ("Unchallenged findings of fact are presumed to be supported by competent evidence and are binding on appeal."). The Director also testified that when she visited the Campground in June 2018, the tent area was marked with a single sign and corresponded to the tent area shown on the 1996 and 1997 site plans. Because a "reasonable mind might accept" this evidence "as adequate to support" the Board's determination of the number of campsites, the Board's determination was supported by substantial evidence. *See Sun Suites*, 139 N.C. App. at 273, 533 S.E.2d at 528.

¶ 29 Petitioner argues that evidence in the record suggested a greater number of campsites than found by the Board. This evidence, Petitioner contends, supports the superior court's findings that 314 campsites for RV, trailer, or camper use, and 78 campsites for tent camping existed at the campground on 1 January 2013, and that

"the property has potential, excluding wetland acreage, to be developed differently, and more intensely, than as proposed by Petitioner." While the court must take into account "contradictory evidence or evidence from which conflicting inferences could be drawn[,]" "[t]he 'whole record' test does not allow the reviewing court to replace the Board's judgment as between two reasonably conflicting views, even though the court could justifiably have reached a different result had the matter been before it de novo[.]" *Thompson v. Wake Cnty. Bd. of Educ.*, 292 N.C. 406, 410, 233 S.E.2d 538, 541 (1977) (citation omitted).

¶ 30        Here, the Board's determination of the number of campsites was supported by substantial evidence. Although there was the evidence from which conflicting inferences could have been drawn, the superior court erred by replacing the Board's judgment with its own, even if "the court could justifiably have reached a different result had the matter been before it de novo[.]" *Id.* The superior court thus incorrectly applied the whole-record test to the issue of the number of campsites at the Campground on 1 January 2013.

**D. Proposed Improvements to the Campground**

¶ 31        Respondent also contends that the superior court erred by reversing the Board's conclusion that the UDO prohibited certain of the proposed improvements to the campground. Respondent argues that the Board correctly concluded that both the general standards regarding nonconforming uses and the specific provisions

concerning nonconforming campgrounds apply to Petitioner's proposed improvements.

¶ 32     Petitioner, on the other hand, argues that the superior court correctly reversed the Board's conclusion that the UDO prohibited certain of the proposed improvements to the campground, but erred by affirming the Board's conclusion that the pool was not a permissible improvement. Petitioner argues that only the specific provisions concerning nonconforming campgrounds in Chapter 8 control, and that the Board committed an error of law by applying the general standards of the UDO concerning nonconforming uses. In Petitioner's view, all of its proposed improvements are permitted under the UDO because they do not expand the Campground's land area or add to the number of campsites that existed on 1 January 2013.

¶ 33     The resolution of this dispute turns on the proper construction of Chapter 8 of the UDO. Chapter 8 of the UDO regulates nonconforming uses. While nonconforming uses "are allowed to continue, and are encouraged to receive routine maintenance[,]" UDO § 8.1.2., the "purpose and intent" of Chapter 8 "is to regulate and limit the continued existence" of nonconforming uses. UDO § 8.1.1. Non-conforming uses and structures "are not favored under the public policy of North Carolina, and zoning ordinances are construed against indefinite continuation of a non-conforming use." *Jirtle v. Bd. of Adjustment for the Town of Biscoe*, 175 N.C. App. 178, 181, 622 S.E.2d 713, 715 (2005) (quotation marks and citation omitted).

¶ 34        Section 8.2.3. provides general standards concerning the "[e]xpansion and [e]nlargement" of nonconforming uses:

> A.    Except in accordance with this subsection, a nonconforming use shall not be enlarged, expanded in area, or intensified.
>
> B.  An existing nonconforming use may be enlarged into any portion of the structure where it is located provided the area for proposed expansion was designed and intended for such use prior to the date the use became a nonconformity. In no instance shall a nonconforming use be extended to additional structures or to land outside the original structure.
>
> C.  Open air uses that are nonconformities, including but not limited to outdoor sales areas, parking lots, or storage yards, shall not be extended to occupy more land area than that in use when the open air use became nonconforming.

U.D.O. § 8.2.3.

¶ 35        Chapter 8 also contains specific provisions governing nonconforming campgrounds. "Existing campgrounds may not be expanded to cover additional land area or exceed the total number of campsites that existed on January 1, 2013." UDO § 8.2.6.B.(1). "Modifications to existing campgrounds are permitted provided the changes do not increase the nonconformity with respect to the number of campsites that existed on January 1, 2013." UDO § 8.2.6.A.(5).

¶ 36        Ordinary principles of statutory construction apply to local zoning ordinances such as the UDO. *See Westminster Homes, Inc. v. Town of Cary Zoning Bd. of Adjustment*, 354 N.C. 298, 303, 554 S.E.2d 634, 638 (2001). Generally, "when two

statutes arguably address the same issue, one in specific terms and the other generally, the specific statute controls." *High Rock Lake Partners, LLC v. N.C. Dep't of Transp.*, 366 N.C. 315, 322, 735 S.E.2d 300, 305 (2012) (citations omitted). But our courts have also recognized that, where possible, general and specific provisions addressing the same subject "should be read together and harmonized[.]" *LexisNexis Risk Data Mgmt. v. N.C. Admin. Off. of Cts.*, 368 N.C. 180, 186, 775 S.E.2d 651, 655 (2015) (quotation marks and citations omitted).

¶ 37     Here, it is possible to construe the general provisions concerning nonconforming uses and the specific provisions concerning campgrounds harmoniously: Section 8.2.3. applies to all nonconforming uses, including nonconforming campgrounds, while section 8.2.6. imposes additional requirements on nonconforming campgrounds. Thus, modifications to a nonconforming campground may not result in it being "enlarged, expanded in area, or intensified[,]" UDO § 8.2.3.A., nor may modifications expand a campground beyond the land area or number of campsites existing as of 1 January 2013, UDO § 8.2.6.B.(1), or otherwise "increase the nonconformity with respect to the number of campsites that existed" on that date, UDO § 8.2.6.A.(5). This construction satisfies the "cardinal rule of statutory construction that significance and effect should . . . be accorded every part of the act, including every section, paragraph, sentence or clause, phrase, and word." *State v. Williams*, 286 N.C. 422, 432, 212 S.E.2d 113, 120 (1975) (quotation marks

and citation omitted).

¶ 38    Moreover, Petitioner's interpretation of Chapter 8 is contrary to the principle that "[a] construction which operates to defeat or impair the object of the statute must be avoided if that can reasonably be done without violence to the legislative language." *Burgess v. Your House of Raleigh, Inc.*, 326 N.C. 205, 215, 388 S.E.2d 134, 140 (1990) (quoting *State v. Hart*, 287 N.C. 76, 80, 213 S.E.2d 291, 295 (1975)). Petitioner's interpretation would allow any and all improvements to a nonconforming campground so long as they do not enlarge the campground's land area or number of campsites beyond that which existed on 1 January 2013 or otherwise change the campground to another nonconforming use under section 8.2.2.    Under this interpretation, an owner could indefinitely extend the lifespan of a nonconforming campground by regularly upgrading the campground with new amenities.    This would contradict the stated purposes of Chapter 8 to "regulate and *limit* the continued existence" of nonconforming uses, UDO § 8.1.1. (emphasis added), and promote the continued viability of a land use that the County has deemed "generally incompatible with the permitted uses in the district[,]" *see* UDO § 8.2.1. (defining nonconforming uses).

¶ 39    The Board's determination that "[t]he new facilities proposed by [Petitioner] qualify as an impermissible expansion, enlargement and intensification of a nonconforming use and are not permitted" was in accordance with law, consistent

with the purpose and intent of UDO Chapter 8 regulating and limiting the continued existence of nonconforming uses, and properly preserved the legislative body's intent. The trial court did not err by affirming the Board's conclusion that the pool was not a permissible proposed improvement. However, the trial court erred by reversing the Board's conclusion that the remainder of the new facilities proposed by Petitioner are an impermissible expansion, enlargement, and intensification of a nonconforming use and are not permitted.

### III. Conclusion

¶ 40      The superior court articulated the proper standard of review to apply to each issue on appeal.

¶ 41      The superior court incorrectly applied the whole record test to the Board's determination of the number of campsites on Petitioner's campground as of 1 January 2013 as the Board's decision concerning the number of campsites on the Campground was supported by substantial, competent evidence in view of the entire record.

¶ 42      The superior court correctly applied *de novo* review and properly affirmed the Board's conclusion that Petitioner's proposed swimming pool is an impermissible expansion, enlargement, and intensification of a nonconforming use and is not permitted under the UDO. The superior court incorrectly applied *de novo* review and erred by reversing the Board's conclusion that the remaining new facilities proposed by Petitioner are an impermissible expansion, enlargement, and intensification of a

nonconforming use and are not permitted.

¶ 43        Accordingly, we affirm the portion of the superior court's order that affirms the Board's conclusion regarding the pool.  We reverse the remainder of the superior court's order and remand this matter to the superior court to affirm the remainder of the Board's order.  The net result is that the Board's order is affirmed.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.

Chief Judge STROUD and Judge WOOD concur.